******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOHN
MARSHALL SPENCE
(AC 36471)

Lavine, Alvord and Wilson, Js.

*Argued January 7—officially released April 26, 2016*

(Appeal from Superior Court, judicial district of
Fairfield, Kahn, J.)

*Jonathan I. Edelstein*, with whom was *David E.
Kelly*, for the appellant (defendant).

*Emily D. Trudeau*, deputy assistant state's attorney,
with whom, on the brief, were *John C. Smriga*, state's
attorney, and *Cornelius P. Kelly*, supervisory assistant
state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, John Marshall Spence, appeals from the trial court's judgment of conviction, rendered after a jury trial, of possession of child pornography in the first degree in violation of General Statutes § 53a-196d (a) (1).[1] On appeal, the defendant claims that the trial court committed error by (1) "denying the defendant's motion to suppress his statements" made to the police prior to his formal arrest; (2) "giving a constructive possession instruction that treated a computer as the equivalent of a premises"; and (3) "permitting the state to offer rebuttal evidence on matters that it knew were at issue during the case-in-chief." We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. The state police began investigating the defendant's activities when they received a tip that a person with a Connecticut Internet protocol (IP) address was downloading child pornography over peer-to-peer file sharing networks.[2] Using a computer program tailored for law enforcement, the state police accessed the identified IP address and downloaded images of child pornography. The state police applied for and were granted an ex parte order to require the Internet service provider to reveal the name and street address associated with the identified IP address. The state police then obtained a search warrant for the defendant's home.

On June 13, 2012, state troopers and local police executed a search and seizure warrant at the defendant's home at 34 May Street in Fairfield. Police entered the home shortly after 6 a.m. and found the defendant, his wife, three children, and mother-in-law in the single family residence. At that time, the lead investigator, state police Detective David Aresco, asked the defendant if he could explain why the state police were in his home. In response, the defendant asked if "he could speak with Detective Aresco in private." Once outside, the defendant received a *Miranda* warning and then provided an oral and written statement acknowledging that he had downloaded more than 150 images and videos of child pornography and that he had exclusive control of the computer where the files were stored.

Before the defendant's trial began, he moved to suppress the statements he made to the state police on the day his home was searched. On September 6, 2013, the trial court conducted a hearing on the motion. Ultimately, the trial court denied the motion and the defendant was convicted by a jury of possession of child pornography in the first degree. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims on appeal that the trial court improperly denied his motion to suppress his state-

ments to the police on the day the search warrant was executed at his home. Specifically, the defendant argues that when the police entered his home and gathered together the residents in one room, based on the circumstances, a reasonable person in his situation would believe he was in custody. Accordingly, he claims that the police should have provided a *Miranda* warning before they asked any questions. Prior to trial, the defendant sought to suppress his initial response to Detective Aresco asking if he could speak to the detective "in private." He also sought to suppress the oral and written statements he made *after* receiving *Miranda* warnings. The defendant argued that the lack of a *Miranda* warning prior to his initial request to speak with the police in private tainted the statements that followed. We conclude that the trial court did not err by denying the motion to suppress and allowing the statements to be admitted as evidence.

The following additional facts that the trial court reasonably could have found are relevant to the defendant's claim. The search warrant was executed at the defendant's home at approximately 6:10 a.m. on June 13, 2012. Eight to ten state troopers and police officers entered the home. The officers were wearing standard issue side arms, bulletproof vests, and clothes that identified that they were law enforcement. The defendant was sleeping on the second floor when the police arrived. After the police conducted a protective sweep of the rooms in the home, they gathered the entire family into the kitchen or dining room area. Without issuing a *Miranda* warning, Aresco informed the residents that he was investigating a computer crime and then asked the defendant if he could explain why the police were in his home. The defendant responded by asking if they could speak in private. The defendant therefore was brought outside to an unmarked police car. He was advised of his *Miranda* rights and signed a waiver notice to confirm that he was aware of his rights. The defendant was questioned and Aresco recorded notes and prepared a written statement. The three page written statement was read back to the defendant. After rereading it and making corrections, the defendant signed the statement and initialed each page. The questioning lasted for approximately one and one-half hours and the defendant was allowed to take a cigarette break. The court held a hearing on the motion to suppress that included testimony from Aresco and another state trooper who was involved with the execution of the search warrant at the defendant's home. The court denied the defendant's motion after concluding that the defendant was not in custody when he initially responded to Aresco's inquiry.

"[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the

evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Collin*, 154 Conn. App. 102, 121, 105 A.3d 309 (2014), cert. denied, 315 Conn. 924, 108 A.3d 480 (2015).

We first consider whether the court properly found that the defendant was not in custody at the time the statements in issue were made. "In order to determine the [factual] issue of custody, however, we will conduct a scrupulous examination of the record . . . in order to ascertain whether, in light of the totality of the circumstances, the trial court's finding is supported by substantial evidence. . . . The ultimate inquiry as to whether, in light of these factual circumstances, a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest . . . calls for application of the controlling legal standard to the historical facts [and] . . . therefore, presents a . . . question of law . . . over which our review is de novo. . . . In other words, we are bound to accept the factual findings of the trial court unless they are clearly erroneous, but we exercise plenary review over the ultimate issue of custody." (Citation omitted; internal quotation marks omitted.) *State* v. *Mangual*, 311 Conn. 182, 197, 85 A.3d 627 (2014).

"[T]he Fifth Amendment privilege [against self-incrimination] is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda* v. *Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). "Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . [A]lthough the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (Internal quotation marks omitted.) *State* v. *Jackson*, 304 Conn. 383, 416, 40 A.3d 290 (2012).

"As used in . . . *Miranda* [and its progeny], custody

is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. . . . In determining whether a person is in custody in this sense . . . the United States Supreme Court has adopted an objective, reasonable person test . . . the initial step [of which] is to ascertain whether, in light of the objective circumstances of the interrogation . . . a reasonable person [would] have felt [that] he or she was not at liberty to terminate the interrogation and [to] leave." (Citations omitted; internal quotation marks omitted.) *State* v. *Mangual,* supra, 311 Conn. 193.

"[N]ot all restrictions on a suspect's freedom of action rise to the level of custody for *Miranda* purposes; in other words, the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody. . . . Rather, the ultimate inquiry is whether a reasonable person in the defendant's position would believe that there was a restraint on [her] freedom of movement of the degree associated with a formal arrest. . . . Any lesser restriction on a person's freedom of action is not significant enough to implicate the core fifth amendment concerns that *Miranda* sought to address." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 194–95.

After reviewing state and federal cases concerning custody, our Supreme Court compiled a nonexclusive "list of factors to be considered in determining whether a suspect was in custody for purposes of *Miranda* [in circumstances involving the interrogation of a suspect during a police search of his residence]: (1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." Id., 197.

A

An application of the factors enumerated in *Mangual* to the facts of this case informs our conclusion that the trial court properly concluded that a reasonable person in the defendant's position would not have believed that he was in police custody of the degree associated with a formal arrest. On the basis of the facts that the trial court reasonably could have found, the police presence did not overwhelm the defendant to the point that a reasonable person would believe that he was in custody.

Any questioning that occurred in the defendant's home was informal in nature and short in duration. Aresco advanced a general question that introduced his presence in the home. The defendant did not answer the question. Instead, he effectively put off any discussion by requesting to speak with the investigators in private. While inside the home, the defendant was not handcuffed or restrained. The surroundings were familiar to the defendant. He was in an open area of the home, and he was surrounded by his family including other adults. While there were as many as ten police officers in the home assisting with the execution of the search warrant, they were not brandishing their weapons.

Considering the totality of the circumstances, the trial court properly determined that the defendant was not in custody and therefore a *Miranda* warning was not required. We do note that Aresco did initiate the questioning and the defendant was not informed by police that he was free to leave. These two *Mangual* factors weigh in favor of a custodial environment, however, a consideration of the remaining factors applied to this case compels the conclusion that a reasonable person in the defendant's position would not have believed that he was in police custody of the degree associated with formal arrest.

The circumstances in this case did not create the police dominated atmosphere that existed in *Mangual.* In that case our Supreme Court determined that when police officers conducted a drug raid by brandishing handguns and rifles in a small apartment, they created a police dominated atmosphere that would cause a reasonable person to believe that he was in police custody even though there had not been a formal arrest.[3] *State* v. *Mangual*, supra, 311 Conn. 199–202. Here, the officers in the defendant's home were not brandishing weapons. A similar number of law enforcement officers were present here as in *Mangual*, however, that case involved a small apartment whereas this was a residential home. See id., 201. Finally, the questioning in *Mangual* was more extensive; there the defendant and her daughters were confined to a couch and there were no other adults present. See id., 186–87, 201–202. The police dominated atmosphere described in *Mangual* was not present in this case. Therefore, no *Miranda* warning was required.

B

The defendant also claims that the trial court should have suppressed the statements he made to police after he received and acknowledged a *Miranda* warning. The defendant argues that the *Mirandized* interrogation was tainted by the alleged unconstitutional questioning that occurred in his home because it was a continuation of the same event. Because we already have determined that during the interaction in the home a reasonable

person in the defendant's position would not have believed that he was in police custody of the degree associated with formal arrest, the defendant's argument for suppressing the subsequent *Mirandized* statement fails. The record shows that the defendant received a *Miranda* warning before he gave his full statement to Aresco and another trooper in their police car. The defendant has not proffered any other evidence to suggest that the defendant's waiver of his right to remain silent was involuntary. The trial court's denial of the defendant's motion to suppress was legally and logically correct and supported by the facts set out in the memorandum of decision. We conclude that the trial court properly denied the motion to suppress the defendant's statements.

## II

The defendant also claims on appeal that the trial court erroneously instructed the jury on constructive possession. The trial court instructed the jury that it could infer that the defendant possessed the images of child pornography if it found that the defendant had control of the computer that contained the images. The defendant argues that the trial court was required to instruct the jury that it could infer possession of pornography only if it found that the defendant had control over the computer *and* the premises within which it was found. We disagree. The trial court was not required to include an instruction regarding control of the premises. Moreover, it was not reasonably possible that the jury was misled by the court's instruction.

The following additional facts are relevant to the defendant's claim. During the course of the trial, Detective Aresco testified that one computer was removed from the defendant's home as a result of the execution of the search warrant on June 13, 2012. The computer was found in the defendant's bedroom, and he told police that he kept it under his bed. The defendant lived in the home with his wife, three children, and his wife's parents. Aresco testified that other computers also were found in the home and examined for child pornography, but only the defendant's computer was found to contain the illicit images. In his statement to the state police, the defendant stated that his computer was password protected and "I am the only person that has that computer—that uses that computer."

Prior to the instruction being read to the jury, defense counsel objected to the language of the instruction because it did not require the jury to find that the defendant also had exclusive control of the home where the computer was located: "It should be [control over the] premises and computer because of the nature of a computer you can be in exclusive possession of it, yet leave it in a common area, and if that common area is not exclusively yours, then someone else has access [to] it." The trial court overruled the objection.

At the close of the trial, the court instructed the jury regarding constructive possession: "The state has submitted evidence in order to show that the defendant had control over the computer where the video files were found. Control of the computer gives rise to the inference of unlawful possession. And the mere access by others is insufficient to defeat this inference. If it is proven that the defendant is the exclusive owner of the computer where the video files were found, then you may infer that he controlled the computer. However, when it is shown that ownership or use of the computer is not exclusive, you may no longer make this inference. The ability to control the computer must be established by independent proof." The court also instructed the jury that in order to convict the defendant, they were required to find beyond a reasonable doubt that he "knowingly possessed the child pornography."

We review instructional impropriety to determine "whether it is reasonably possible that the jury was misled. . . . In determining whether the jury was misled, [i]t is well established that [a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . The charge must be considered from the standpoint of its effect on the jury in guiding [it] to a proper verdict. . . .

"Our review of the defendant's claim of instructional error requires that we examine the court's entire charge to determine whether it was reasonably possible that the jury could have been misled by the omission of the requested instruction. While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Conyers*, 161 Conn. App. 467, 472–73, 127 A.3d 1077 (2015).

To be convicted of possession of child pornography in the first degree, the jury must find that the defendant knowingly possessed the contraband. General Statutes § 53a-196d (a) (1). "Possess, as defined in § 53a-3 (2), means to have physical possession or otherwise to exercise dominion or control over tangible property. . . . Our jurisprudence elucidating this definition teaches that such possession may be actual or constructive.

. . . Nevertheless, [b]oth actual and constructive possession require a person to exercise dominion and control over the [contraband] and to have knowledge of its presence and character. . . . Actual possession requires the defendant to have had direct physical contact with the [contraband]. . . . Typically, the state will proceed under a theory of constructive possession when the [contraband is] not found on the defendant's person at the time of arrest, but the accused still exercises dominion and control. . . . In this regard, [t]he essence of exercising control is not the manifestation of an act of control but instead it is the act of being in a position of control coupled with the requisite mental intent. In our criminal statutes involving possession, this control must be exercised intentionally and with knowledge of the character of the controlled object." (Citations omitted; internal quotation marks omitted.) *State* v. *Bowens*, 118 Conn. App. 112, 120–21, 982 A.2d 1089 (2009), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010).

The court's instruction included an explanation of each of the elements the jury had to find present in order to convict the defendant of the alleged crime.[4] Finding control of the home in this case is not a requirement to infer possession of the contraband when the contraband is contained within another object, here the computer, that itself could be controlled and secured through the use of a password. "To mitigate the possibility that innocent persons might be prosecuted for . . . possessory offenses . . . it is essential that the state's evidence include more than just a temporal and spatial nexus between the defendant and the contraband. . . . While mere presence is not enough to support an inference of dominion or control, where there are other pieces of evidence tying the defendant to dominion and control, the [finder of fact is] entitled to consider the fact of [the defendant's] presence and to draw inferences from that presence and the other circumstances linking [the defendant] to the crime." (Internal quotation marks omitted.) *State* v. *Smith*, 94 Conn. App. 188, 193–94, 891 A.2d 974, cert. denied, 278 Conn. 906, 897 A.2d 100 (2006). It was not necessary for the jury to find that the defendant controlled the premises in order to infer that he possessed the child pornography.

The court's failure to include the language regarding "control of the premises" could not have reasonably misled the jury. The defendant argues that the instruction the trial court delivered to the jury improperly modified this state's model instruction by substituting "computer" for "premises." Of course, varying the wording of the model instruction does not mean that the instruction provided was an incorrect statement of the law. Regarding possession, our criminal model jury instructions provide in relevant part: "A complete instruction on possession may require explanations of constructive possession and nonexclusive possession

*if relevant to the case. Tailor this instruction according to the specific allegations of possession.*" (Emphasis added.) Connecticut Criminal Jury Instructions (4th Ed. 2008, Revised November 17, 2015) § 2.11-1, available at http://jud.ct.gov/ji/Criminal/part2/2.11-1.htm (last visited April 14, 2016).

The court's instruction was proper because a reasonable jury could make a rational conclusion that if the defendant had control of the computer, then he had possession of its contents. "[I]t is a function of the jury to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . Because [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . However, [t]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such consideration as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Internal quotation marks omitted.) *State* v. *Billie*, 123 Conn. App. 690, 696, 2 A.3d 1034 (2010).

The substance of the charge allowed the jury to infer that the defendant had possessed child pornography if it found that the defendant had exclusive control of the computer. On the basis of the evidence presented, the jury reasonably could have concluded that the defendant was the only person with control and access to the password protected computer that contained child pornography. Therefore, this instruction was both reasonable and logical. The constantly changing nature of technology and crime require that judges have the flexibility to adapt model jury instructions to the facts of a case. Read as a whole, the trial court's instruction adequately explained to the jury each of the elements required before a person may be convicted of possession of child pornography in the first degree. It was not reasonably possible that the jury was misled by the instruction regarding possession. The defendant, therefore, was not deprived of a fair trial on the basis of improper jury instructions.

III

Finally, the defendant claims that the trial court

abused its discretion when it allowed the state to present rebuttal evidence concerning the clock settings on the defendant's computer. Although the state had the opportunity to present this evidence during its case-in-chief, the evidence in question became relevant only when the defendant opened the door by presenting an alibi defense that he was working when the pornographic images were downloaded. The trial court did not abuse its discretion by allowing the state to present its rebuttal evidence.

The following additional facts are relevant to the defendant's claim. During the presentation of the state's case-in-chief, defense counsel cross-examined Detective Aresco about the dates and times that the pornographic images were downloaded to the defendant's computer. Defense counsel provided Aresco with a copy of the state police computer analysis report that had been generated following an examination of the defendant's computer. Using the report to refresh his memory, Aresco read the dates and times captured in the report for when specific files were downloaded.[5] On redirect examination, Aresco testified that based on his training, the report's recorded download time was not reliable evidence.[6] On recross-examination, Aresco testified that the file download times captured in the report may have been off by at least two hours from the time when the files were actually downloaded by the defendant because Aresco observed that the clock in the computer was set to the Pacific time zone.[7] The next day, after the state rested and prior to the defense presenting any witnesses, the state informed the court that following his testimony, Aresco had further reviewed file download times and found that his testimony regarding a two hour difference in time was incorrect. Aresco was now prepared to testify that when he examined the computer he observed a nine hour difference between the clock in the defendant's computer and the "actual time."[8] The state informed the court and defense counsel that Aresco would be presented as a rebuttal witness. The defendant objected to any rebuttal testimony regarding the time to which the clock in the computer was set because he considered it to be new forensic evidence that was available to the state before it rested its case. The trial court deferred making a ruling on the objection so it could consider the defendant's argument.

The defendant then called as his first witness a manager from the bus company where he was employed. The manager testified to the dates and times when the defendant drove his bus route. The defendant sought to establish that he was driving a bus at the time that the child pornography images were downloaded to his computer. This theory was predicated on Aresco's earlier testimony regarding when each illicit image was downloaded to the defendant's computer.

After the defendant rested his case, the trial court found that the defendant would not be prejudiced by rebuttal testimony from Aresco because the defendant had been given notice of the state's claim that the time recorded on the computer was inaccurate.[9] Aresco returned to the witness stand and testified that he had been mistaken in his prior testimony and that he had observed a nine hour difference between the time on the clock in the defendant's computer and the "actual time."[10] The defendant cross-examined Aresco about why his testimony changed and the difference in time.

"The admission of rebuttal evidence ordinarily is within the sound discretion of the trial court. In considering whether a trial court has abused its discretion, appellate courts view such a trial court ruling by making every reasonable presumption in favor of the decision of the trial court." (Internal quotation marks omitted.) *Embalmers' Supply Co.* v. *Giannitti*, 103 Conn. App. 20, 57, 929 A.2d 729, cert. denied, 284 Conn. 931, 934 A.2d 246 (2007).

"[R]ebuttal evidence is that which refutes the evidence presented by the defense. . . . When a defendant offers evidence in his defense, it is appropriate for the state to offer evidence to refute it, if possible." (Citation omitted; internal quotation marks omitted.) *State* v. *Cavell*, 235 Conn. 711, 727, 670 A.2d 261 (1996). "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. . . . The doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. . . . Thus, in making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal." (Internal quotation marks omitted.) *State* v. *Brown*, 309 Conn. 469, 479, 72 A.3d 48 (2013).

On the basis of our review, we conclude that the trial court did not abuse its discretion by permitting the state to recall the pertinent witness to clarify an earlier representation as to when child pornography was downloaded to the defendant's computer. The testimony was proper rebuttal evidence. The defendant was on notice of the timing issue and was able to cross-examine the witness on rebuttal. See *State* v. *Cavell*, supra, 235 Conn. 728 (state forensic analysis that was not relevant during case-in-chief was allowed as rebuttal evidence). The state was not required to prove the timing of when

the child pornography was downloaded, only that the defendant was in possession of it. It was the defense that made relevant the computer recorded download times.

It is true that the state could have determined the exact discrepancy between the clock in the computer and the actual time prior to the presentation of its case-in-chief, but the topic became relevant only when the defendant raised the issue during cross-examination of Aresco. In this case, the defendant opened the door to the issue of download times in order to lay the foundation for the later testimony of the defendant's employer, who would assert that the defendant was working at the time when the images allegedly were downloaded. The defendant never filed a notice of an alibi defense that would have informed the state of this theory. Therefore, prior to the cross-examination of Aresco, it was reasonable for the state to believe that the timing of the image downloads was not relevant to the trial and not a topic that required the presentation of evidence.

Following the defendant's cross-examination of Aresco, the state took immediate steps to determine the actual temporal discrepancy and informed the trial court and the defendant that it would seek to introduce rebuttal evidence. Prior to presenting his defense, the defendant was aware that the state was prepared to offer rebuttal evidence regarding the computer time. The defendant did not seek a continuance to afford himself time to address the state's additional evidence. The trial court was within its discretion to allow the state to refute the testimony presented by the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-196d (a) provides in relevant part: "A person is guilty of possessing child pornography in the first degree when such person knowingly possesses (1) fifty or more visual depictions of child pornography . . . ."

[2] During the trial, state police Detective David Aresco described peer-to-peer file sharing: "A peer-to-peer file share network is a network that facilitates the transfer of digital files from one user to another user. When I say one user, I mean one computer user signed onto the network . . . ."

[3] In *Mangual*, the police made a "show of force that included drawn handguns [and] one or more rifles . . . ." Id., 200.

[4] "[I]n summary, the state must prove beyond a reasonable doubt that the defendant possessed child—that one, the defendant possessed child pornography, two, he was aware of the nature and contents of the material, and three, it consisted of fifty or more visual depictions. If you unanimously find the state has proved beyond a reasonable doubt each of the elements of the crime of possessing child pornography in the first degree, then you shall find the defendant guilty."

[5] The words "created" and "downloaded" were used interchangeably during the trial. Both were references to the date and time recorded by the computer when an image was added to the defendant's computer hard drive.

[6] "[The Prosecutor]: [Detective Aresco] [y]ou referenced before the file created time, and you gave an explanation as to what that means. But in your experience and training in this particular area, does that have any significant value in your investigation?

"[The Witness]: No, sir. . . .

"[The Prosecutor]: And why is that, sir?

"[The Witness]: Those times are not reliable.

"[The Prosecutor]: And why is that?

"[The Witness]: Because it's capturing that time from the time that is set on the computer . . . . That time is coming off of whatever time [the defendant's computer] was presently set at when that file was created or any file is created. And I have no way of verifying what time a particular computer was set at. No forensic examiner would come up here and testify to the reliability of times because they can be manipulated."

[7] "The time was off. It was set to Pacific time and I did the calculation, I believe it was two hours off to the actual time." Aresco stated that he could testify about the setting of the clock in the computer only as of the date when he examined the computer, not any previous date when the files were actually downloaded. His review of the clock in the computer occurred two weeks prior to the defendant's trial in September, 2013.

[8] "[A]ctual time" is the phrase that Aresco used throughout his testimony to differentiate between the time he observed on the clock in the computer and the time on the day when he was examining the computer.

[9] The court stated: "[T]he defense certainly knew the state's claim would be that the time was off. Maybe not specifically the exact time differential, but that did come out through the redirect of the forensic examiner. So, they were on notice of that. And then prior to calling specifically the defense witness, the state, although it didn't have to, certainly put the defense on notice that they had gone back and checked the exact time differential, and it was greater than either Pacific time or two hours, which was the testimony based on recollection, and was actually nine hours.

"So, given that, I don't believe the defendant was prejudiced. This is an issue that obviously the defense raised. I understand why the defense raised it. But the state should be able to respond to it. And I don't believe there was—there's prejudice by calling the witness to rebut that testimony."

[10] "[The Witness]: I checked the time of the computer, the imaged computer just to make sure that my testimony as far as, you know, me believing that it was two hours off was accurate.

"[The Prosecutor]: Okay. And what did you do with respect to that issue?

"[The Witness]: I actually turned on the laptop computer that I used to make the demos. And that laptop computer contained the imaged hard drive, the hard drive that we seized the day of the search warrant. So, I turned on the computer and I checked the time.

"[The Prosecutor]: And what did you find with respect to checking the time?

"[The Witness]: I found that the time was actually nine hours and twenty-two minutes off, meaning the time of the computer was nine hours and twenty-two minutes ahead of the actual time."