******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* EUGENE EDWARDS, JR.
(SC 19735)

Rogers, C. J., and Palmer, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued December 12, 2016—officially released April 11, 2017*

*Timothy H. Everett*, assigned counsel, for the appellant (defendant).

*Jonathan M. Sousa*, special deputy assistant state's attorney, with whom, on the brief, were *Brian Preleski*, state's attorney, and *Brett J. Salafia*, senior assistant state's attorney, for the appellee (state).

*Opinion*

EVELEIGH, J. The defendant, Eugene Edwards, Jr., appeals from the judgment of the trial court convicting him of home invasion in violation of General Statutes § 53a-100aa (a) (2), robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), larceny in the second degree in violation of General Statutes § 53a-123 (a) (3), and assault of an elderly person in the third degree in violation of General Statutes § 53a-61a (a) (1) arising out of an incident in Wethersfield.[1] On appeal to this court, the defendant asserts that: (1) the trial court improperly denied his motion to suppress certain statements that he had made to police; (2) the trial court abused its discretion when it allowed a police officer to present nonexpert testimony regarding cell phone records and maps; and (3) the evidence was insufficient to support his convictions. We agree with the defendant that the trial court improperly allowed the police officer to present certain testimony regarding the cell phone records and maps, but find such error was harmless. We disagree with the defendant's other claims and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found. On June 22, 2012, the victim, Lieslotte Worysz, went grocery shopping at a Stop and Shop grocery store in Rocky Hill. After completing her shopping, she returned to her home in Wethersfield. While driving home, the victim noticed a motor vehicle driving behind her. The victim testified that the vehicle was a Chrysler 300 and that she was able to identify its make and model because she and her husband previously owned Chryslers and "were into cars." The victim further stated that the vehicle was "fairly new" and a "light color," explaining as follows: "[It] follow[ed] me [at] a distance . . . and I admired [it]. I figured gee, the grill, everything is beautiful. I like it."

Upon returning home, the victim used a remote to open the door to her attached garage and parked her vehicle inside. The victim noticed that the vehicle that had been following her home was parked behind her in the driveway. As the victim was about to exit her vehicle, the defendant, who was the driver of the vehicle that had follower her, approached her in the garage, held a black gun to her stomach and demanded money. The victim said to the defendant, "why are you doing this to me? I didn't do nothing to you," and tried to exit her vehicle, but the defendant pushed her back down into the driver's seat and said, "[Y]ou shut up. If you're going to scream. I'm going to hurt you. I'm going to shoot you." The defendant then took the victim's remote and closed the garage door with both of them inside. The defendant grabbed the victim's pocketbook and took the money that was inside. He also took the victim's diamond ring, wedding band, watch, and keys.

Afterward, the defendant opened the garage, threw the victim's keys and remote on the driveway, and left the scene. The victim picked up the items that the defendant had discarded, went into her house, and called the police.

When the police arrived, they took several photographs of the scene. The victim told police about the Chrysler 300 and provided a description of the driver, but she could not identify him in a photographic array. Detectives Christopher Morris and James Darby of the Wethersfield Police Department processed the scene and the victim's belongings for fingerprints and DNA analysis. They obtained several latent fingerprints from the driver's door of the victim's vehicle and swabbed the victim's vehicle, remote, and wallet for DNA analysis.

Darby processed the driver's side of the victim's vehicle for fingerprints because the victim "had reported that as she was exiting [her vehicle], she was robbed and made by the suspect to sit back down inside [her vehicle]." Darby took six "hinge lifters" and marked the locations for each lift. Morris sent the lifts to the Hartford Police Department, which found no matches. Morris then took the lifts to the state forensic laboratory. John Brunetti from the state forensic laboratory testified regarding his analysis of two latent partial prints obtained from the victim's vehicle. He concluded that they matched, respectively, the defendant's left middle and index fingers.

Thereafter, Morris went to the grocery store where the victim had been shopping and obtained the security video from the parking lot. Upon reviewing the video, Morris noted a white vehicle following the victim out of the parking lot. Upon further review of the video, Morris and the other officers noted several characteristics about that vehicle, namely, a black scuff mark on the rear bumper, an E-ZPass or some other form of transponder device on the front windshield, and a third brake light in the center of the vehicle's trunk that did not appear to be functioning properly. The vehicle had a Connecticut license plate on the front bumper, but officers were unable to obtain the plate number from the security video. Morris later showed the video to employees of a Chrysler dealership, who confirmed that the vehicle in the video was a Chrysler 300.

On June 25, 2012, Morris shared information about the case with other police departments and the media in order to obtain investigative leads from members of the public. The report released by the media described the perpetrator of the crime as a black male between thirty and forty years old, approximately five feet ten inches to six feet tall, medium build and short black hair. The report also described the vehicle allegedly used in the robbery, including that it may have had an E-ZPass or other form of transponder device on the front windshield.

The New Britain Police Department provided Morris with information on three white Chrysler 300 vehicles that had some contact with the police, including one that belonged to the defendant. On June 25, the same day that the media released information about the robbery, Morris drove to the defendant's address in New Britain and photographed his white Chrysler 300. Morris noticed that the defendant's vehicle had a black scuff mark on its rear bumper, which was consistent with the mark on the vehicle in the surveillance video. Morris then ran the vehicle's plate number through the license plate reader database and discovered that the Newington police had photographed the defendant's front license plate on June 1, 2012. Morris also discovered that the defendant's father, Eugene Edwards, Sr., had an E-ZPass account and that the transponders can easily be transferred between vehicles.

On June 27, 2012, two days after the media released the report of the robbery, Morris asked Officer Ronald Floyd of the Wethersfield Police Department to conduct further surveillance on the defendant's vehicle. Floyd drove to the defendant's house in New Britain and took several photographs of the defendant's vehicle, which was parked approximately 200 yards from the house in a school parking lot. Floyd's photograph of the front of the defendant's vehicle showed that it no longer had a front license plate and that material from the front bumper where the license plate screws had been placed was protruding, which indicated that the plate had recently been removed. Floyd observed two vertical marks on the front windshield, just below the rearview mirror, which were consistent with leftover adhesive from an E-ZPass or other similar transponder device. In Floyd's photograph, there was a New York Giants bumper sticker on the rear bumper, which was not in the photograph of the defendant's vehicle taken two days earlier. In addition, the photograph taken by Floyd showed that white paint had been applied to the black scuff mark on the rear bumper.

On June 28, 2012, officers drove to the defendant's home in New Britain to execute a search warrant. Inside the defendant's house, the officers found the front license plate to the defendant's Chrysler 300, which had been hidden underneath the seat cushion of a sofa. The officers also discovered a black handheld BB gun in a bedroom closet.

The defendant remained outside while the police searched his home. The defendant also volunteered information about his vehicle to Detective Michael Patkoske of the Wethersfield Police Department. The defendant said that the scratches on his rear bumper had been there since he had purchased the vehicle, that the New York Giants bumper sticker had been on his rear bumper since 2011, and that he never had an E-ZPass account. The defendant also told Patkoske that

his front license plate was under the couch and that it had been knocked off the car as a result of a motor vehicle accident in New York in 2011. The officers did not, however, observe any damage to the front of the defendant's car or on the license plate found in the home. Police seized the defendant's vehicle as evidence, and after further inspection, they determined that the third brake light on the vehicle was functioning properly. The defendant's nephew, Justin Collins, testified that the defendant had told Collins to tell the police that the BB gun was his if the police asked.

On July 3, 2012, Patkoske called the defendant and asked him if he would be willing to speak with him about his vehicle and his whereabouts in June, 2012. Although they had not discussed the dates of the Wethersfield or Berlin robberies; see footnote 1 of this opinion; the defendant told Patkoske "I wasn't even here . . . when all that stuff was going on, whenever that happened." He said that he was in North Carolina from June 19 to June 22 for his aunt's funeral and that he was with his girlfriend, Caryn Prince, in Virginia from June 1 to June 9, but he was not confident of the dates. The defendant gave Prince's cell phone number to Patkoske and told him to check with her on the dates of the Virginia trip. Patkoske then called Prince twice on that same day to confirm the defendant's whereabouts. In between those two telephone calls, the defendant called Prince and told her that the police "were trying to frame him" and that, if the police called her, she should say that "he was with [her]." Prince told Patkoske that she was with the defendant in Virginia in May not in June. Patkoske later learned that the defendant was in Connecticut on June 22, 2012, because he had obtained a receipt from a retail store showing that the defendant had transacted business in Connecticut on that date.

On September 19, 2012, the defendant appeared at the Wethersfield police station and was placed under arrest. The defendant maintained that he was not the perpetrator of the robberies, and he told Morris that he had "the wrong tall, thin black male," and that "no one picked him out of a lineup . . . ."

Thereafter, the defendant was charged, inter alia, with home invasion in violation of § 53a-100aa (a) (2), robbery in the first degree in violation of § 53a-134 (a) (2), larceny in the second degree in violation of § 53a-123 (a) (3), and assault of an elderly person in the third degree in violation of § 53a-61a (a) (1). See footnote 1 of this opinion. After a five day trial, the jury convicted the defendant of these charges. The trial court thereafter rendered judgment in accordance with the jury's verdict and sentenced the defendant to four concurrent terms of incarceration: twenty years for home invasion, twenty years for robbery in the first degree, one year for assault of an elderly person in the third degree and

ten years for larceny in the second degree. This appeal followed.[2] Additional facts will be set forth as necessary.

On appeal, the defendant claims that: (1) the trial court improperly denied his motion to suppress certain statements that he had made to police; (2) the trial court abused its discretion when it allowed Morris to present certain nonexpert testimony regarding cell phone records and maps; and (3) the evidence was insufficient to support his convictions. We address each of these claims in turn.

I

The defendant claims that the trial court improperly denied his motion to suppress certain statements that he made to the police. Specifically, the defendant asserts that the trial court improperly denied his motion to suppress statements made to the police during the execution of the search warrant at his home on June 28, 2012, and after his arrest on September 19, 2012, because he was not advised of his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The state responds that the trial court properly denied the defendant's motion to suppress because the statements were not made during a custodial interrogation. We agree with the state.

The following additional facts are relevant to this claim. Before trial, the defendant filed a motion to suppress, claiming that his statements to the police should not be admitted at trial because the police failed to advise him of his *Miranda* rights. After a hearing, the trial court found the following facts: "As part of their investigation, the Wethersfield Police Department obtained a search warrant for a white Chrysler 300 registered to the defendant at 39 Nye Street, New Britain, the residence of the defendant.

"On June 28, 2012 . . . Patkoske was in an unmarked police vehicle . . . . After waiting for a period of time, the white vehicle, believed to be the defendant's, was observed driving to the [defendant's] residence. Once the defendant's vehicle entered the driveway, the police vehicle's lights were activated. The operator, identified as [the defendant], was asked to exit the vehicle and be subjected to a [patdown] for weapons. The passenger in the vehicle . . . Collins . . . was also subjected to a weapons search.

"There were no weapons found [during the patdown]. The defendant was advised of the search warrants and the intended locations of the search. Information was obtained that there were other people in the residence. Those individuals were asked to exit during the execution of the search warrant for the residence. A search of the residence and the [vehicle] was conducted.

"While the searches were being conducted . . . Patkoske testified that he remained outside of the residence, near the vehicle. . . . Patkoske testified that

the defendant was outside the residence, walking around the driveway, while not under arrest, nor handcuffed. Patkoske testified that during this time, the defendant spoke to him. The nature of the conversations were: why the police were there, information concerning the vehicle, [the] scratches on the vehicle, [the New York Giants] bumper sticker, and that the vehicle never had an [E-ZPass transponder] on the windshield.

"There was also a discussion about the front marker plate of the vehicle. . . . Patkoske testified that he inquired of the defendant about the front plate. The defendant stated that the plate was knocked off the vehicle in an accident in New York, and that it [had] been off the vehicle for about a year. The defendant further stated that he was the only one who drives the vehicle.

"[Patkoske] testified that he remained at the 39 Nye Road location for the duration of the approximately two hour search of the residence and vehicle.

"On September 19, 2012 . . . Morris of the Wethersfield Police Department contacted the defendant indicating that he could pick up his vehicle at the station. This was a ruse to get the defendant to come to the police [station] to be arrested. Upon the defendant's arrival, he was placed under arrest. While under arrest and proceeding through the booking process . . . Morris indicated that he inquired of the defendant only biographical questions.

"During the processing of the [uniform arrest record] . . . Morris testified that the defendant stated that he was not the same person that was arrested in New York fifteen years ago, that [that is] all they got on him, and no one picked him out of a lineup. At the time of these statements, the defendant was under arrest, but had not yet been read his *Miranda* advisements." (Internal quotation marks omitted.) The trial court denied the defendant's motion to suppress in its entirety.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is [well-defined]. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Smith*, 321 Conn. 278, 288, 138 A.3d 223 (2016); see also *State* v. *Betances*, 265 Conn. 493, 500, 828 A.2d 1248 (2003).

In order to establish that he was entitled to *Miranda* warnings, a defendant must show that he was in custody when he made the statements and that he made the statements in response to police questioning. *State* v. *Mangual*, 311 Conn. 182, 192, 85 A.3d 627 (2014). In

assessing whether a person is in custody for purposes of *Miranda*, "the ultimate inquiry is whether a reasonable person in the defendant's position would believe that there was a restraint on [his] freedom of movement of the degree associated with a formal arrest. . . . Any lesser restriction on a person's freedom of action is not significant enough to implicate the core . . . concerns [of the fifth amendment to the United States constitution] that *Miranda* sought to address." (Citation omitted; footnote omitted; internal quotation marks omitted.) Id., 194–95.

"The defendant bears the burden of proving that he was in custody for *Miranda* purposes. . . . Two discrete inquiries are essential to determine custody: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. . . . The first inquiry is factual, and we will not overturn the trial court's determination of the historical circumstances surrounding the defendant's interrogation unless it is clearly erroneous. . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. . . . The ultimate determination of whether a defendant was subjected to a custodial interrogation, therefore, presents a mixed question of law and fact, over which our review is de novo." (Internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 459, 996 A.2d 251 (2010).

"[W]hether a defendant was subjected to interrogation . . . involves a similar two step inquiry . . . . Because this framework is analogous to the determination of whether a defendant is in custody, the ultimate determination, therefore, of whether a defendant already in custody has been subjected to interrogation also presents a mixed question of law and fact over which our review is plenary, tempered by our scrupulous examination of the record to ascertain whether the findings are supported by substantial evidence." (Citation omitted.) *State* v. *Mullins*, 288 Conn. 345, 364, 952 A.2d 784 (2008). "Interrogation, as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." (Internal quotation marks omitted.) *State* v. *Vitale*, 197 Conn. 396, 412, 497 A.2d 956 (1985).

A

The defendant first asserts that the trial court improperly denied his motion to suppress the statements to police on June 28, 2012, because he was subjected to custodial interrogation.[3] Specifically, the defendant asserts that a reasonable person would not have felt he or she was able to leave. The defendant does not claim that the trial court's factual findings were clearly erroneous.

In regard to statements made by the defendant on June 28, 2012, the trial court found as follows: "In addressing this issue, the court reviews the testimony presented at the October 18, 2013 hearing, which was previously indicated in this memorandum. In reviewing that testimony, the court considers that the defendant was confronted and asked to exit the vehicle. . . . Patkoske testified that he [did not] recall whether he had his firearm exposed, but was prepared for the potential of the defendant being in possession of a firearm and that he protected himself.

"[Patkoske] testified that once the defendant was out of his vehicle and the [patdown] was conducted, he was released and free to leave. The testimony presented was that the defendant was walking around the property, free to leave.

"The court finds the testimony of . . . Patkoske credible. Considering the law previously indicated and the credible facts presented, the court finds that the defendant was not 'in custody' for [the purpose of *Miranda*].

"The court does not find 'custody' for the purposes of a *Miranda* advisement. Therefore, the court need not address the 'interrogation' aspect of custodial interrogation."

In *Mangual*, we set forth "the following nonexclusive list of factors to be considered in determining whether a suspect was in custody for purposes of *Miranda*: (1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." *State* v. *Mangual*, supra, 311 Conn. 196–97; see also *State* v. *Arias*, 322 Conn. 170, 177, 140 A.3d 200 (2016).

The record demonstrates that, although Patkoske engaged in a brief patdown of the defendant and Collins, he informed all occupants in the home, including the defendant, that they were free to leave. The defendant was not handcuffed or restrained after the patdown. Indeed, the defendant was walking around the property and many family members remained at the property, in the backyard of the home. The record further demonstrates that one officer remained outside in the vicinity of the defendant's vehicle, and that the defendant himself initiated the conversation with the police about his vehicle.

The defendant asserts that the fact that the officers arrived at the defendant's home utilizing the police sirens and lights, ordered the defendant and Collins out of the vehicle and conducted a search of the home pursuant to the search warrant is sufficient to establish that a reasonable person would believe he was not free to leave.[4] We disagree. The trial court found that "once the defendant was out of his vehicle and the [patdown] was conducted, he was released and free to leave. The testimony presented was that the defendant was walking around the property, free to leave." We find the Appellate Court's reasoning in *State* v. *Spence*, 165 Conn. App. 110, 118–19, 138 A.3d 1048, cert. denied, 321 Conn. 927, 138 A.3d 287 (2016), persuasive on this issue. In *Spence*, the Appellate Court concluded that "the police presence did not overwhelm the defendant to the point that a reasonable person would believe that he was in custody." Id., 118. The Appellate Court reasoned that "[t]he surroundings were familiar to the defendant. He was in an open area of the home, and he was surrounded by his family including other adults. While there were as many as ten police officers in the home assisting with the execution of the search warrant, they were not brandishing their weapons." Id., 118–19. Similarly, in the present case, the defendant was outside, in the open air, able to walk around the property, including into the area where the rest of his family was waiting. On the basis of these factual findings, we conclude that the trial court properly determined that the defendant was not in custody when he made statements to the police on June 28, 2012.

B

The defendant next claims that the trial court improperly denied his motion to suppress the statements made to police on September 19, 2012. In regard to these statements, the trial court found as follows: "In addressing this issue, the court reviews the testimony presented at the October 18, 2013 hearing . . . .

"The testimony of . . . Morris was that the defendant was asked to come to the Wethersfield Police Department to retrieve his vehicle. Upon arrival, the defendant was placed under arrest and handcuffed. The defendant was processed through the booking procedure.

"While under arrest . . . Morris indicated that the defendant asked for [an attorney] and a bail commissioner. The court has analyzed the credible testimony against the law, as it relates to custody previously indicated. After review, the court finds that the defendant was in custody at the time he is alleged to have made the statements sought to be suppressed. "Therefore, the court finds custody existed for the purposes of a *Miranda* advisement.

"[Morris] indicated that he did not advise the defen-

dant pursuant to *Miranda* at that time. [Morris] testified that the defendant asked for an attorney and a bail commissioner. The testimony indicates that the defendant made the statements sought to be suppressed.

"Having addressed the issue of custody, the court directs its attention to whether [an] interrogation, as defined by our law, occurred. . . .

"[Morris'] testimony indicates that, other than biographical questions, he made no inquiries of the defendant. The defendant indicated that he was aware of a lack of identification made by complainants and that he was not the same person as his past criminal record could show. There is no evidence presented that . . . Morris interrogated the defendant as our laws define.

"The court finds . . . that the defendant was in custody, but not subject to interrogation or questioning by words or actions on the part of . . . Morris that [he] should have known were reasonably likely to elicit incriminating responses from [the defendant]." (Citations omitted.)

In support of his claim that the defendant was subject to interrogation, the defendant asserts that the fact that Morris used a "ruse" to convince the defendant to come down to the police station is sufficient to establish that he subjected the defendant to interrogation. Specifically, the defendant asserts that Morris should reasonably have known that the surprise arrest was likely to elicit an incriminating response from the defendant. We disagree.

It is well established that the term "interrogation" under *Miranda* "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Vitale*, supra, 197 Conn. 411–12.

It is also clear that "[i]nterrogation, as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself. . . . Voluntary statements of any kind are not barred by the fifth amendment." (Citation omitted; internal quotation marks omitted.) Id., 412; see also *United States* v. *Glen-Archila*, 677 F.2d 809, 815 (11th Cir.) (arrest does not transform situation into one of

"functional interrogation"), cert. denied, 459 U.S. 874, 103 S. Ct. 165, 74 L. Ed. 2d 137 (1982). "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda* v. *Arizona*, supra, 384 U.S. 478.

In *Vitale*, this court found that statements made by a defendant to a uniformed corrections officer after being arrested and while confined to a cell in a correctional center were not barred by *Miranda*. *State* v. *Vitale*, supra, 197 Conn. 409–12. In doing so, this court reasoned as follows: "It is clear from the record that the statements in question were not the result of conduct designed to elicit incriminating statements. They were volunteered by the defendant during a general conversation between him and [the corrections officer], wherein the defendant spoke freely about the offenses with which he was charged. Although there is no doubt that the defendant was in custody, his statements were not in response to interrogation." Id., 412. Similarly, in the present case, the defendant, himself, initiated the conversation with Morris during the booking process. The trial court found that, other than "biographical" questions, Morris "made no inquiries of the defendant." Instead, the defendant volunteered that he was "not the same person that was arrested in New York fifteen years ago." Therefore, that statement and the statements that followed were admissible. See *State* v. *Mullins*, supra, 288 Conn. 365–66 (no interrogation where defendant initiated conversation with police); cf. *State* v. *Gonzalez*, 302 Conn. 287, 297–98, 25 A.3d 648 (2011) (officer's statement to defendant in interview room that "it was his opportunity to tell his side of the story" was functional equivalent of interrogation because it explicitly sought statements from defendant regarding his involvement in crime).

The defendant asserts that the fact that Morris used a ruse concerning the release of the defendant's vehicle to get the defendant to come to the police station demonstrates a level of coercion sufficient to establish that the statements following the arrest are barred by the fifth amendment. We disagree. It is undisputed that Morris intended the ruse concerning the release of the defendant's vehicle to subject the defendant to custody in a location that was deemed more safe than attempting to place the defendant in custody inside of his home; the plan was not designed to subject the defendant to an interrogation.

Indeed, the evidence established that the defendant did not make any incriminating statements at the time he was being arrested or when he first discovered the ruse. Instead, the defendant made statements concerning his New York arrest and that no one picked him out of a lineup after Morris and other officers arrested him and escorted him to the booking area. Therefore, the ruse did not cause the defendant's statements. Fur-

thermore, Morris testified that he never asked the defendant any questions that would have elicited those statements. To the contrary, Morris informed the defendant that he would not be asking him any questions and gave him the opportunity to contact an attorney. On the basis of these facts, we conclude that the defendant was not subjected to an interrogation before making his statements to police on September 19, 2012.

Because the defendant was not in custody during the search of his home on June 28, 2012, and was not subjected to an interrogation before making his statements to the police on September 19, 2012, we conclude that the trial court properly denied the defendant's motion to suppress.

## II

The defendant next claims that the trial court improperly admitted testimony from Morris regarding cell phone data and maps regarding cell tower coverage areas without determining that the evidence was based on reliable scientific principles under *State* v. *Porter*, 241 Conn. 57, 80–90, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). In response, the state does not assert that Morris did not provide expert testimony, but instead claims that a *Porter* hearing was not required because Morris did not provide expert testimony based on scientific evidence. Further, the state asserts that even if Morris' testimony was improperly admitted into evidence, it was harmless. We agree with the defendant that the trial court abused its discretion by allowing Morris to testify about cell phone data without qualifying him as an expert witness, but find that the error was harmless.

The following additional facts are relevant to the resolution of this issue. Prior to trial, the defendant filed a motion in limine seeking to preclude the admission of cell phone data and requested a hearing pursuant to *State* v. *Porter*, supra, 241 Conn. 57. The trial court postponed ruling on the defendant's motion until trial.

Outside of the presence of the jury, the trial court allowed the state to make its offer of proof regarding the cell phone data. In its first offer of proof, the state presented Cherylene Paddock, an employee of Verizon, who was the custodian of records. After hearing her testimony, the trial court ruled that Paddock could not give an "engineering or technical opinion" based upon the records. On October 25, 2013, the trial court revisited whether Paddock was qualified to testify about issues such as call strength and whether cell calls connect to the cell tower closest to the cell phone.

After she was questioned further regarding her training at Verizon, the court ruled as follows: "I ruled yesterday that . . . Paddock is an expert as to records. She has indicated that by her testimony. She has indicated that she is the custodian of records. She is not an expert

as to scientific or technological type issues. She's indicated that by the testimony she's given as well as her admissions, her statements. She has indicated and we all note it by her testimony that she cannot testify about, I guess for lack of a better term, I'm using her term, engineer related questions including range from cell phone to a particular [cell] tower because her basis of knowledge on this topic was not experience or education but rather someone told her what to say. The ruling allowed initially that the records were admissible subject to some redaction. . . . Paddock testified briefly and then continued to today.

"The court continued to consider this issue about the relevancy of the cell tower location information without a correlation to where the cell phone would be approximately located with reference to the [cell] tower because the basis of my understanding and thought process if there were no range indications then a jury would not know if a cell phone caller was standing ten feet from the [cell] tower or ten miles away. So the court . . . reviewed the testimony . . . of . . . Paddock, and there was testimony concerning the location of the [cell] tower with reference to a cell phone [and] testimony [that the cell phone] would be picking up the closest [cell] tower. I wanted to clarify that so I listened to her testimony that was recorded and we brought her in this morning and I appreciate the state bringing her in for that purpose. The court inquired of her . . . basis of knowledge to that fact being that the cell phone calls [are] picked up by the closest [cell] tower. She's indicated that that was on the record but basically that it came from her training to be a custodian of records. So the court is still faced with the relevancy argument not cleared up by the further testimony of . . . Paddock.

"So reviewing the records that have been offered, cell phone information concerning . . . phone calls made from an out-of-state location is within the records. I think it was questioned by [defense counsel] about roaming. So that is on the record and without a need for specified, or specific, or expert knowledge. So the records of cell phone calls between June [19 and 22], the court says are relevant and are allowed. Cell phone information from the records concerning in state, out-of-state issues between June 12 and 14, again are they made in state or are they made out of state. There again is no need for specified knowledge and that is allowed. However, the specified calls on June 1 and 22, and I'm speaking about later in the day on June 22, are offered for a specific cell . . . tower location and an approximate location of where the user is involves a specific knowledge. Someone needs to come in with knowledge and a basis of knowledge other than someone told her." Thus, the court concluded as follows: "My ruling is obviously, the records are custodian issues and the records under a business record, but specifically . . .

Paddock is precluded from testifying about cell . . . tower locations on the date and time of the incident. Those are those dates that we talked about, those five dates."

The state then made a second offer of proof through Morris. Morris testified that, approximately five months before trial, he had attended a three day training in Massachusetts on "advanced cell phone investigations" and mapping of cell towers from phone call "records that we receive from [cell phone] companies." Morris testified that he had worked with cell phone records "[n]umerous, numerous times . . . [w]ay more than ten." Morris explained that in the training he had learned how to use computer software entitled Microsoft Streets and Trips to analyze data from a cellular provider. Specifically, Morris testified that he could use the program to map cell towers that may have handled calls and to show the coverage area of those calls. He briefly described the terms "azimuth" and "bismuth" and explained that those terms defined the coverage area of the cell tower.

The state then asked Morris whether he had used "this exercise" on the cell phone records provided by Verizon for the defendant's cell phone. Morris responded that he had used the data provided by Verizon to create certain maps showing cell tower coverage. Morris further testified that his use of the data provided by Verizon enabled him to conclude that a cell tower located approximately 1200 feet from the grocery store where the victim had shopped had "handled calls made from [the defendant's] cell phone at three different times" while the victim was shopping there. Morris further testified that he had also completed a similar analysis for the victim's home address and had found that there were calls from the defendant's cell phone accessing a cell tower nearby. Morris further indicated that he could go "through the same exercise" for other locations and that his conclusions would be based on his "training and experience." On cross-examination, when asked how he determined an azimuth, bismuth and something called an "optimal bismuth," Morris stated that they are provided by the records that he obtains from any given cell provider. Morris agreed that he had been instructed to use "extreme caution when making any firm conclusion about coverage area" and he acknowledged that network congestion, weather, maintenance issues, natural topology, thick foliage, and manmade structures can affect coverage.

The trial court then ruled that the state had met its burden of establishing the reliability of the proffered evidence and that Morris was qualified by his expertise to analyze cell phone data provided in Verizon records. The trial court ruled as follows: "The court and counsel may recall that when I amended my ruling of yesterday this morning, the crux or the keystone of the ruling

was that the specified calls on June 1 and 22 . . . are offered for a specific cell tower location and approximate cell phone user location and involves a specific knowledge. Someone needs to come in with knowledge of and basis of knowledge. . . . That was what the . . . crux [of the court's] concern was.

"After listening to [Morris], the court feels that [he] has the education and training to competently testify [about cell] tower[s] and how [they connect] to cell phones. . . . I'm reviewing his experience. He's done it before. He's been working on it for a while. That's his expertise within the police department. He has training on the job and he has educational training. He specifically indicated what his educational training [is] and it very much appears to this court that [defense counsel] knows what that educational training is because he was cross-examining him about what occurred at that class. So the educational training is there. The training on the job is there. The expertise is there. And he testified in the offer of proof appearing to be knowledgeable of the subject, a knowledge that would aid the finders of fact."

The trial court admitted the Verizon cell phone records as a full exhibit through Paddock. Morris then testified before the jury. During his testimony, the state admitted into evidence, over defense counsel's objection, maps Morris made depicting cell towers that were used in cell phone calls and their coverage areas. Defense counsel then cross-examined Morris.

We begin with our standard of review. "We review a trial court's decision [regarding the admission of] expert testimony for an abuse of discretion. . . . We afford our trial courts wide discretion in determining whether to admit expert testimony and, unless the trial court's decision is unreasonable, made on untenable grounds . . . or involves a clear misconception of the law, we will not disturb its decision. . . . Although we afford trial courts significant discretion, [w]here it clearly appears that an expert witness is qualified to give an opinion, the exclusion of his testimony may be found to be [an abuse of discretion]. . . . To the extent the trial court makes factual findings to support its decision, we will accept those findings unless they are clearly improper. . . . If we determine that a court acted improperly with respect to the admissibility of expert testimony, we will reverse the trial court's judgment and grant a new trial only if the impropriety was harmful to the appealing party. . . .

"We also note our standards for admitting expert testimony. Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . [T]o render an expert opin-

ion the witness must be qualified to do so and there must be a factual basis for the opinion." (Citations omitted; internal quotation marks omitted.) *Weaver* v. *McKnight*, 313 Conn. 393, 405–406, 97 A.3d 920 (2014).

"In *Porter*, we followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that testimony based on scientific evidence should be subjected to a flexible test to determine the reliability of methods used to reach a particular conclusion. . . . A *Porter* analysis involves a two part inquiry that assesses the reliability and relevance of the witness' methods. . . . First, the party offering the expert testimony must show that the expert's methods for reaching his conclusion are reliable. A nonexhaustive list of factors for the court to consider include: general acceptance in the relevant scientific community; whether the methodology underlying the scientific evidence has been tested and subjected to peer review; the known or potential rate of error; the prestige and background of the expert witness supporting the evidence; the extent to which the technique at issue relies [on] subjective judgments made by the expert rather than on objectively verifiable criteria; whether the expert can present and explain the data and methodology underlying the testimony in a manner that assists the jury in drawing conclusions therefrom; and whether the technique or methodology was developed solely for purposes of litigation. . . . Second, the proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . . Put another way, the proponent of scientific evidence must establish that the specific scientific testimony at issue is, in fact, derived from and based [on] . . . [scientifically reliable] methodology. . . .

"Additionally, we recognized in *Porter* that, [t]he actual operation of each [*Porter*] factor, as is the determination of which factors should be considered at all, depends greatly on the specific context of each case in which each particular [threshold admissibility] analysis is conducted. . . . There is, however, a critical postulate that underlies the *Porter* factors and indeed underlies the entire *Porter* analysis: in order for the trial court, in the performance of its role as the gatekeeper for scientific evidence, properly to assess the threshold admissibility of scientific evidence, the proponent of the evidence must provide a sufficient articulation of the methodology underlying the scientific evidence. Without such an articulation, the trial court is entirely ill-equipped to determine if the scientific evidence is reliable upon consideration of the various *Porter* factors. Furthermore, without a clear understanding as to the methodology and its workings, the trial court also cannot properly undertake its analysis under the fit requirement of *Porter*, ensuring that the

proffered scientific evidence, in fact, is based upon the reliable methodology articulated." (Citations omitted; internal quotation marks omitted.) *Fleming* v. *Dionisio*, 317 Conn. 498, 506–507, 119 A.3d 531 (2015); see also *Maher* v. *Quest Diagnostics, Inc.*, 269 Conn. 154, 180–81, 847 A.2d 978 (2004).

A

We begin with the threshold issue of whether the trial court allowed Morris to testify regarding the cell phone data as an expert witness. The following additional facts are relevant to our resolution of this issue. During the charging conference, the trial court engaged in the following colloquy with the prosecutor and defense counsel:

"The Court: . . . I have listed two experts . . . Dan Renstrom, Forensic Examiner I from the Connecticut State Forensic Laboratory, [and] Brunetti, supervisor from the latent prints section of [the] Connecticut State Forensic Laboratory. Did I miss anybody?

"[The Prosecutor]: I think for part of . . . Morris' testimony, Your Honor, at least the court alluded to his expertise in regard to the cell phone issue.

"[Defense Counsel]: . . . That may have gone to something outside the presence of the jury. I don't believe that there was any reference made to him being an expert when he was called to the stand in front of the jury.

"The Court: Right. . . . I think he was considered not an expert, but somebody, for lack of a better term, superior knowledge on the subject matter. And I don't think he gave any opinions if my recollection serves me.

"[The Prosecutor]: No, I don't believe he gave any opinions, Your Honor, but I know that the court, and it was outside the presence of the jury, did refer to him with that characterization.

"The Court: Right. Okay. So I take it that you don't want to include him.

"[Defense Counsel]: No, I would not include him.

"The Court: All right. I did not include him because I didn't think he was an expert, just somebody with superior knowledge. So I'm just going to leave it right now with . . . Renstrom and . . . Brunetti with the standard instruction I always give on that."

This court recently explained that "[e]xpert opinions concerning scientific, technical or other specialized knowledge may be necessary to assist the trier of fact in understanding the evidence or in determining a fact in issue. . . . Although expert testimony may be helpful in many instances, it is required only when the question involved goes beyond the field of ordinary knowledge and experience of the trier of fact. . . . The trier of fact need not close its eyes to matters of com-

mon knowledge solely because the evidence includes no expert testimony on those matters. . . . Whether expert testimony is required in a particular case is determined on a case-by-case basis and its necessity is dependent on whether the issues are of sufficient complexity to warrant the use of the testimony as assistance to the . . . court." (Citations omitted; internal quotation marks omitted.) *State* v. *Buhl*, 321 Conn. 688, 700, 138 A.3d 868 (2016).

This court has not had the opportunity to address whether a police officer needed to be qualified as an expert witness before he could be allowed to testify regarding cell phone data, but the Court of Appeals of Maryland addressed this issue in *State* v. *Payne*, 440 Md. 680, 700, 104 A.3d 142 (2014). In that case, the state asserted that the police officer need not be qualified as a witness because he "did not render an opinion as to the location of [the defendants'] cell phones and that he merely read [the cell phone company's] business records and followed its directions in interpreting the data." Id. The court rejected the state's claim and concluded that the police officer "engaged in a process to derive his conclusion that [the defendants'] cell phones communicated through [specific] cell towers that was beyond the ken of an average person; his conclusions regarding the communication path also required that he be qualified as an expert witness. Although the [s]tate urges that a layperson with the same phone records and instructions could have determined the location of the cell sites (even aside from the fact that the jury never received the full records and that the step-by-step instructions were developed from another source), additional training and experience were required to parlay the process from which [the police officer] derived the communication path of each call." (Internal quotation marks omitted.) Id., 700–701.

Similarly, in the present case, although Morris relied on data he obtained from Verizon to conduct his analysis, the process he used to arrive at his conclusions was beyond the ken of average juror. Indeed, even the trial court acknowledged that Morris had an expertise that allowed him to be more knowledgeable on the subject of cell phone data than the average juror.

The trial court explained that "Morris has the education and training to competently testify [about cell] tower[s] and how [they connect] to cell phones. . . . I'm reviewing his experience. He's done it before. He's been working on it for a while. That's his expertise within the police department. He has training on the job and he has educational training. He specifically indicated what his educational training [is] and it very much appears to this court that [defense counsel] knows what that educational training is because he was cross-examining him about what occurred at that class. So the educational training is there. The training on the job is

there. The expertise is there. And he testified in the offer of proof appearing to be knowledgeable of the subject, a knowledge that would aid the finders of fact." The trial court explicitly stated that Morris was "somebody with superior knowledge."

On the basis of these findings, we conclude that the trial court admitted Morris' testimony as an expert witness, one who could aid the trier of fact in an area that is "beyond the ken of the average juror."[5] (Internal quotation marks omitted.) *State* v. *Williams*, 317 Conn. 691, 703, 119 A.3d 1194 (2015).

### B

Having determined that the testimony provided by Morris was expert testimony, now we must examine whether the evidence introduced through Morris was of a scientific nature such that a hearing under *State* v. *Porter*, supra, 241 Conn. 57, was required.

In the present case, Morris testified at trial regarding the cell phone data provided to him by Verizon. The data, in the form of a list of cell towers and calls made by a cell phone that was registered to the defendant, was introduced as a full exhibit as a business record through Paddock, the custodian of records for Verizon. Although Morris was asked to review the data and stated that he recognized the data as that which he had received from Verizon in an electronic format, his testimony did not come directly from the data provided by Verizon.[6] Instead, Morris' testimony explained various maps that he had created by inputting the data provided by Verizon into a computer program called Microsoft Streets and Trips.

Morris explained the process for making the maps as follows: "I would import the data that comes through on a Microsoft Excel spreadsheet from Verizon . . . into a software product that we use called Microsoft Streets and Trips. It's just a mapping software program that can . . . take the latitude and longitude of the cell tower.

"Now, the latitude and longitude of the cell tower is . . . provided to me by Verizon . . . . They give me a list of all the cell towers that they have in the state of Connecticut . . . the tower number that they assign to that [cell] tower, and the latitude and longitude for that [cell] tower.

"And then . . . I look at the list to see the call that I'm looking for, the one that I want to map onto it, so in this case the call at 10:49 a.m., I would look there to see which . . . cell tower did it access and which cell face did it access and then I'd plot that on the map using what the azimuth is. . . .

"So in this particular map here, the azimuth is 270 degrees, so I start out with a red line indicating . . . the azimuth, and then they tell me that the . . . optimal

beam width is 65.5, so I'd split that in half on either side of the azimuth, so that gives me a pie shaped figure of what the strongest signal of the cell phone coverage would be. And then I would take, knowing that there's only three cell faces for this [cell] tower for Verizon, I would use 60 degrees on each side, which brings us again, to the 120 [degrees] for that particular cell face and make a bigger pie to show that that cell face can handle this entire area."

Morris further testified as follows:

"[The Prosecutor]: And what does that pie . . . tell us?

"[Morris]: It tells you that . . . the call most likely came from that . . . section in there. . . .

"[The Prosecutor]: And . . . what did you mean by that?

"[Morris]: The . . . colored area that I shaded in between the outer lines of the . . . total beam width and the exterior coverage for . . . that [cell] tower, anything inside those borders is where the call most likely came from. And the way I determined the border for how far away that call would most likely have originated from is by looking at all the other [cell] towers on the map to see the halfway point between this [cell] tower and the next [cell] tower over there, the halfway point between the [cell] tower here and the next [cell] tower over there and just all the way in a circle and creating this—it's not always a perfect circle because [cell] towers are placed in different positions."

Morris then testified about cell phone calls made on the dates of the Berlin and Wethersfield incidents. See footnote 1 of this opinion. For each of these cell phone calls, he made maps using the process previously described. Specifically, Morris created a cell tower coverage map for calls associated with the defendant's cell phone on June 22, 2012, at 10:05 a.m., 10:10 a.m. and 10:13 a.m., the approximate time during which the victim was inside of the grocery store. Then, in response to questioning from the state, Morris pointed to the location of the grocery store on the map that he had created, showing that it was within the coverage area of the cell tower accessed by the defendant's cell phone during those calls. Morris also testified that he had created a cell tower coverage map for calls associated with the defendant's cell phone on June 22, 2012, at 10:41 a.m. and 10:46 a.m., the approximate time of the attack at the victim's home. Then, in response to questioning from the state, Morris pointed to the location of the victim's home on the map he created, showing that the victim's home was within the coverage area of the cell tower accessed by the defendant's cell phone during those calls.

The defendant asserts that the trial court abused its discretion by admitting testimonial and documentary

evidence through Morris without determining that the evidence was based on reliable scientific methodology. This court has not previously had the opportunity to examine the criteria for determining the admissibility of cell phone data. The issue has, however, been addressed in federal court. See *United States* v. *Mack*, United States District Court, Docket No. 3:13CR00054 (MPS) (D. Conn. November 19, 2014).

In *Mack*, the government "propose[d] to elicit from [the government's expert witness, a special agent, certain] testimony about methods that [the Cellular Analysis and Survey Team within the Federal Bureau of Investigation] uses to estimate the geographical coverage areas of certain cell . . . towers and, using these methods, an opinion about the approximate areas in which [the cell phones associated with the defendants] were located when they made and received specific cell phone calls around the time [of the crime]." Id. The court conducted a *Daubert* hearing in which the agent testified about his qualifications and the methodology he used to arrive at his conclusions. Id. After the hearing, the court concluded that the agent's methodology was reliable based on the fact that it was "commonly relied upon by law enforcement and the cell phone industry," that "he himself has used those methods many times with good results, including in kidnapping and missing-persons investigations," and that "in his experience, it is an unusual case in which the actual coverage area of a cell tower differs greatly from the estimation derived from this method." Id. On the basis of the foregoing, the court concluded that the methodology was sufficiently reliable to meet the requirements of *Daubert* and that, therefore, the government's expert could testify regarding his conclusions. Id.

The approach of the United States District Court for the District of Connecticut is consistent with decisions from many other federal courts that have required the government to demonstrate that the methodology used by their expert witness on cell phone data "clears the hurdle imposed by *Daubert* . . . ." *United States* v. *Machado-Erazo*, 950 F. Supp. 2d 49, 56 (D.D.C. 2013); see also *United States* v. *Jones*, 918 F. Supp. 2d 1, 5–6 (D.D.C. 2013); *United States* v. *Davis*, United States District Court, Docket No. 11-60285-CR (ESH) (S.D. Fla. May 17, 2013).

On the basis of the foregoing, we conclude that the trial court improperly admitted testimony and documentary evidence in through Morris without qualifying him as an expert and conducting a *Porter* hearing in order to ensure that his testimony was based on reliable scientific methodology.

### C

Having concluded that the trial court improperly admitted the cell phone data and cell tower coverage

maps into evidence, we must determine whether the error was harmless.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Favoccia*, 306 Conn. 770, 808–809, 51 A.3d 1002 (2012). We note that, in the present case, the defendant makes no claim of constitutional error. For the following reasons, we conclude that the trial court's improper admission of Morris' testimony regarding the cell phone data was harmless.

After reviewing the evidence in the present case, we cannot conclude that the admission of Morris' testimony and the cell tower coverage maps substantially affected the verdict in the present case. First and foremost, the defendant was charged with crimes relating to two separate incidents and Morris' testimony regarding cell phone data and cell tower coverage maps regarding both incidents was entered into evidence. Nevertheless, the jury acquitted the defendant on all charges related to the Berlin incident. See footnote 1 of this opinion. The fact that the jury was able to acquit the defendant on some charges is strong evidence that the improperly admitted evidence did not substantially affect the verdict. See *State* v. *Medrano*, 308 Conn. 604, 629, 65 A.3d 503 (2013) ("[t]he fact that the jury acquitted the defendant of murder and found him guilty of manslaughter in the first degree demonstrates that the jury believed the defendant's testimony, regardless of the court's [improper] instruction").[7]

Second, even without Morris' testimony, the jury still could conclude from the cell phone records themselves that the defendant's cell phone accessed cell towers in Rocky Hill and Wethersfield on the date of the robbery, which coincides with the victim's testimony that she was followed from the grocery store in Rocky Hill and robbed at her home in Wethersfield.

Third, defense counsel rigorously cross-examined

Morris on the accuracy of the cell phone data. As a result, Morris acknowledged that he could not guarantee that his maps accurately reflect "the state of the network on June 22, 2012," that the cell phone's connection with a specific cell tower does not necessarily mean that it is connecting with the cell tower closest in range and that he could not determine from the cell phone records the exact location of the defendant's cell phone.

Fourth, when compared to the other evidence of guilt—namely, the fingerprint evidence, the victim's testimony, the surveillance video showing a vehicle of the same make and model as that owned by the defendant, the consciousness of guilt evidence, and the defendant's statements to police—we cannot conclude that Morris' testimony substantially affected the verdict. Indeed, as more fully discussed in part III A of this opinion, the state presented overwhelming evidence of the defendant's identity as the perpetrator of the crimes. Accordingly, we cannot conclude that the trial court's improper admission of Morris' testimony regarding the cell phone data and the cell tower coverage maps substantially affected the jury's verdict.

## III

Finally, the defendant claims that there was insufficient evidence to support his convictions. Specifically, the defendant asserts that there was insufficient evidence to support his convictions of home invasion, robbery in the first degree, larceny in the second degree, and assault of an elderly person in the third degree because the state failed to establish the element of identity. The defendant also asserts that there was insufficient evidence to support his conviction of home invasion because the state failed to establish that he was armed with a deadly weapon. The state responds that there was sufficient evidence to support the defendant's convictions on all counts. We agree with the state.

In reviewing a sufficiency of the evidence claim, we apply a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves

the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, [w]here a group of facts are relied upon for proof of an element of the crime it is their cumulative impact that is to be weighed in deciding whether the standard of proof beyond a reasonable doubt has been met and each individual fact need not be proved in accordance with that standard. It is only where a single fact is essential to proof of an element, however, such as identification by means of fingerprint evidence, that such evidence must support the inference of that fact beyond a reasonable doubt. . . .

"As we have often noted, however, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]t is immaterial to the probative force of the evidence that it consists, in whole or in part, of circumstantial rather than direct evidence." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 311 Conn. 408, 419–20, 87 A.3d 1101 (2014); see also *State* v. *Otto*, 305 Conn. 51, 65–66, 43 A.3d 629 (2012).

A

The defendant asserts that there was insufficient evidence to support the jury's finding that the defendant was the perpetrator of the crimes for which he was convicted. Specifically, the defendant asserts that this court's prior holding in *State* v. *Payne*, 186 Conn. 179, 440 A.2d 280 (1982), requires reversal in the present case. In response, the state claims that the evidence was sufficient to establish identity and that *State* v. *Payne*, supra, 186 Conn. 179, does not require reversal because the defendant's conviction in the present case was not based on fingerprint evidence alone. We agree with the state.

We begin with a review of *State* v. *Payne*, supra, 186 Conn. 179. In that case, the defendant claimed that the evidence against him was insufficient as a matter of law because "of the [well established] rule that a conviction may not stand on fingerprint evidence alone unless the prints were found under such circumstances that they could only have been impressed at the time the crime was perpetrated." Id., 182. In considering the defendant's claim, this court acknowledged that it had previously recognized and relied on the rule asserted by the defendant. Id.

Indeed, this court previously had reversed a convic-

tion that was based primarily upon fingerprint evidence in *State* v. *Mayell*, 163 Conn. 419, 426, 311 A.2d 60 (1972), concluding "[t]he fact that the defendant's fingerprints were on the rearview mirror of the abandoned vehicle, in and of itself, is of no moment. Unless it can be shown that the circumstances are such that the fingerprints could have been impressed only at the time the crime was perpetrated, the presence of the defendant's fingerprints on the rearview mirror does not establish his connection with the crime charged." In *Mayell*, because the defendant was "regularly employed to drive the vehicle and was rightfully in it six hours before the time the crime was committed," this court concluded that the presence of the fingerprints on the rearview mirror were not sufficient to establish his connection with the crime. Id.

In *State* v. *Payne*, supra, 186 Conn. 179, the state did not challenge the rule used in *Mayell* and relied upon by the defendant, nor did the state assert that the defendant's fingerprints could only have been impressed during the commission of the crime. Indeed, the state did not "present any evidence dating the defendant's fingerprints or otherwise limiting their impression to the circumstances of the crime." Id., 183. Instead, the state asserted that the rule applied in *Mayell* was not applicable because the state had presented other evidence of identity upon which the jury could have relied in reaching their verdict against the defendant. Id. Specifically, the state asserted that a statement by the victim describing "one of the perpetrators as a short, black male no more than sixteen or seventeen years old" provided other evidence of identity. Id.

This court rejected this claim, concluding that "[a]lthough the description relied upon by the state arguably fits the defendant, it is far too general to provide any corroboration of the fingerprint evidence. That the general description is insufficient to tie the defendant to the crime is readily apparent when it is recalled that the victim, the very one who provided that description, was unable to identify the defendant as the person he described." (Footnote omitted.) Id., 184. This court therefore reversed the conviction of the defendant, concluding that "the [well established] rule that a conviction may not stand on fingerprint evidence alone unless the prints were found under such circumstances that they could only have been impressed at the time the crime was perpetrated" applied. Id., 182, 184.

In the present case, the evidence establishing the identity of the defendant was not based on the fingerprint evidence alone.[8] To the contrary, the state presented numerous other key pieces of evidence to establish the element of identity. First, the state presented evidence regarding the victim's description of the perpetrator of the crime and that the defendant fit that description.

Second, the state presented evidence regarding the vehicle that the victim identified as being driven by the perpetrator of the crime. The evidence established that the defendant owned a vehicle that was the same make and model as the vehicle the victim identified as being driven by the perpetrator of the crime.

Third, the state presented evidence regarding the vehicle that drove out of the parking lot behind the victim in the surveillance video from the grocery store. The evidence established that the defendant's vehicle was the same make and model as the vehicle in the surveillance video from the grocery store on the date of the crime. The evidence also established that the defendant's vehicle had other identifiable characteristics—namely, a black scuff mark on the rear bumper and the prior indication of an E-ZPass or other transponder device attached to the windshield—as the vehicle in the surveillance video.

Fourth, the state offered evidence of consciousness of guilt. The evidence established that the defendant engaged in verbal and nonverbal conduct, such as changing his vehicle's appearance, offering unsolicited details to the police and attempting to distance himself from the crime that can fairly be inferred to have been influenced by the criminal act. See *State* v. *Weinberg*, 215 Conn. 231, 255, 575 A.2d 1003 ("he engaged in verbal and nonverbal conduct, such as changing both his personal appearance and his car's appearance and offering unsolicited details to the police, that can fairly be inferred to have been influenced by the criminal act"), cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). In the present case, the state introduced evidence to establish that the defendant made changes to his vehicle's appearance after the police released a statement to the media containing a description of the vehicle involved in the incident. Specifically, Morris and Floyd testified that the front license plate had been recently removed. Morris also testified that a New York Giants bumper sticker had been placed on the vehicle's rear bumper and that paint had been applied to the black scuff mark on the rear bumper after the media released the report with a description of the vehicle. Furthermore, the state also introduced evidence to establish that the defendant volunteered statements to the police regarding the changes to his vehicle. Specifically, while officers were executing the search warrant of his home, the defendant volunteered that the New York Giants bumper sticker had been on his vehicle's rear bumper since 2011, which is inconsistent with the photograph taken by Morris on June 25, 2012. During this time, the defendant also told police that his front license plate had been knocked off the vehicle as a result of a motor vehicle accident in 2011, which was inconsistent with photographs obtained from the state license plate reader database on June 1, 2012, in which

his vehicle's front license plate was intact and there appeared to be no damage to the front end of his vehicle. The state also introduced evidence that the defendant attempted to distance himself from the crime. Specifically, the defendant instructed Collins to claim ownership of the BB gun if the police asked about it and instructed Prince to say that he was out of state with her on the day of the incident. It is well established that "[i]n a criminal trial, it is relevant to show the conduct of an accused, as well as any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act. . . . The state of mind which is characterized as guilty consciousness or consciousness of guilt is strong evidence that the person is indeed guilty . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Reid*, 193 Conn. 646, 655, 480 A.2d 463 (1984); see id., 656 (attempt to fabricate alibi reflects consciousness of guilt); see also 2 J. Wigmore, Evidence (Chadbourn Rev. 1979) § 273, p. 115.

On the basis of the foregoing evidence, we cannot conclude that *State* v. *Payne*, supra, 186 Conn. 179, requires the reversal of the defendant's conviction. Unlike that case, the present case is not one in which the only evidence of identity is fingerprint evidence. To the contrary, construing the evidence in the light most favorable to sustaining the verdict, and the inferences reasonably drawn therefrom, the jury reasonably could have concluded that the cumulative force of the evidence established the element of identity beyond a reasonable doubt.

B

The defendant next asserts that the state failed to present sufficient evidence that he was " 'armed with a deadly weapon,' " an element required for his convictions of both home invasion and robbery in the first degree. Specifically, the defendant claims that, although the evidence established that he owned an operable BB gun, it failed to establish that he used the BB gun in the attack. The defendant claims that, without this connection, the jury reasonably could not have concluded that he was "armed with a deadly weapon" for purposes of §§ 53a-100aa (a) (2)[9] and 53a-134 (a) (2).[10] The state responds that the evidence sufficiently established that the defendant committed the crimes with the BB gun that was later found in his residence. We agree with the state.

As charged in the present case, both §§ 53a-100aa (a) (2) and 53a-134 (a) (2) required proof that the defendant was armed with a deadly weapon. The defendant and the state do not dispute what the term "armed with a deadly weapon" means. It is undisputed that the term "armed" means that the defendant physically possessed the weapon. See *State* v. *Tinsley*, 181 Conn. 388, 399–400, 435 A.2d 1002 (1980), cert. denied, 449 U.S. 1086,

101 S. Ct. 874, 66 L. Ed. 2d 811 (1981), overruled in part on other grounds by *State* v. *Pinnock*, 220 Conn. 765, 788, 601 A.2d 521 (1992). A " '[d]eadly weapon' " is "any weapon, whether loaded or unloaded, from which a shot may be discharged . . . ." General Statutes § 53a-3 (6). Thus, if the weapon is a firearm, the state must prove that it is operable, meaning that it is capable of firing a shot. See General Statutes § 53a-3 (19) (defining firearm as weapon from which shot may be discharged). Furthermore, it is undisputed that an operable BB gun is a deadly weapon. *State* v. *Grant*, 294 Conn. 151, 157–61, 982 A.2d 169 (2009).

At trial, the victim testified that, during the robbery, the perpetrator held a "black gun" in his hand. When the police executed the search warrant at the defendant's residence, they seized a black handheld BB gun, which was later determined to be capable of discharging a shot. The appearance of the BB gun matched the victim's description of the gun used during the robbery.

We conclude that the fact that a BB gun matching the victim's description of the gun used during the robbery was found in the defendant's residence is sufficient to establish that the BB gun was used in the robbery. See, e.g., *State* v. *Miles*, 97 Conn. App. 236, 241, 903 A.2d 675 (2006) (gun recovered months after crime met witness' description of "small silver handgun" seen at crime); *State* v. *Hardy*, 85 Conn. App. 708, 717, 858 A.2d 845 (2004) (victim's testimony that gun was " 'a little silver' " in color and silver air pistol found in defendant's apartment sufficient to establish that air pistol was gun used in robbery), aff'd, 278 Conn. 113, 896 A.2d 755 (2006).

Moreover, the state presented evidence that the defendant told Collins to tell the police that the BB gun belonged to Collins. The jury reasonably could have inferred that the defendant instructed Collins in this manner because the defendant knew that the BB gun was involved in the robbery.

The defendant relies on *State* v. *Coleman*, 35 Conn. App. 279, 287, 646 A.2d 213, cert. denied, 231 Conn. 928, 648 A.2d 879 (1994), to support his claim that the state was required to prove a nexus between the BB gun found in the defendant's home and the gun used in the robbery in order for the BB gun to have probative value. We find *State* v. *Coleman*, supra, 35 Conn. App. 279, to be unpersuasive. First, in *Coleman*, the Appellate Court concluded that the trial court had abused its discretion in admitting testimony about knives found in the defendant's car without any evidence linking them to the robbery, but the admission was nevertheless harmless. Id., 285–89. In the present case, however, the defendant's claim is based on insufficient evidence, not that the trial court improperly admitted evidence related to the BB gun. Furthermore, in a different appeal involving the same defendant and similar facts, this court con-

cluded that the Appellate Court had improperly concluded that the trial court abused its discretion in admitting testimony relating to the knives. *State* v. *Coleman*, 241 Conn. 784, 789, 699 A.2d 91 (1997). This court reasoned as follows: "The trial testimony indicated that the defendant had entered the victim's apartment by way of slits made in the window screen by a sharp cutting instrument. The state introduced evidence of the knives to show that the defendant, twenty-two hours after the offense, had a number of sharp cutting instruments at his immediate disposal." Id., 789–90. This court further explained that "[i]t is the generally accepted rule that in a case in which the defendant is charged with the offense of burglary, after proof of the burglary has been introduced the prosecution may show that the defendant had burglar tools or implements in his possession soon after the time of the commission of the offense and may introduce such tools or implements in evidence. . . . *Sanders* v. *United States*, 238 F.2d 145, 147 (10th Cir. 1956); see also *State* v. *Thomas*, [205 Conn. 279, 283, 533 A.2d 553 (1987)] (where victim bound by rope, testimony regarding clothesline in defendant's basement admissible to show defendant had access to rope); *State* v. *Miller*, 202 Conn. 463, 482, 522 A.2d 249 (1987) (where victim bound by handcuffs, evidence that handcuffs were used at defendant's workplace admissible to show defendant's access to handcuffs); *State* v. *Smith*, 198 Conn. 147, 157, 502 A.2d 874 (1985) (where defendant threatened victim with gun, evidence that gun with similar appearance was in defendant's possession shortly after crime admissible to show defendant's access to gun); *State* v. *Paoletto*, 181 Conn. 172, 184–86, 434 A.2d 954 (1980) (in burglary case where entry was gained by forcibly tearing down door of building, evidence of pry bar and screwdriver found in defendant's possession admissible to show defendant's access to type of burglary tools used)." (Internal quotation marks omitted.) *State* v. *Coleman*, supra, 241 Conn. 790.

On the basis of the foregoing, we conclude that the evidence of the BB gun found in the defendant's home, which matched the description of the weapon used by the perpetrator of the crime, was sufficient for the jury reasonably to have determined that the defendant was armed with a deadly weapon.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The defendant was also charged with home invasion in violation of § 53a-100aa (a) (2), robbery in the first degree in violation of § 53a-134 (a) (2) and larceny in the second degree in violation of § 53a-123 (a) (3) arising out of an incident in Berlin. The trial court consolidated the two cases for trial. After trial, the jury acquitted the defendant of all charges arising out of the incident in Berlin.

[2] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] In its brief, the state asserts that the defendant does not claim that he

was subjected to interrogation on June 28, 2012. We disagree, and conclude that the defendant asserts that he was both in custody and subjected to interrogation on June 28, 2012. Nevertheless, because we conclude that the trial court properly determined that the defendant was not in custody when he made statements to the police on June 28, 2012, we need not reach the issue of whether he was subjected to interrogation.

[4] The defendant asserts that he and Collins were ordered out of the vehicle at gun point. The evidence at the suppression hearing was not definitive and the trial court credited Patkoske's testimony that he could not remember whether he had brandished a weapon. The defendant has not challenged that factual finding as clearly erroneous.

[5] The defendant does not claim that the trial court's failure to include Morris in its instruction on expert witnesses was improper. Therefore, we do not address that issue.

[6] Although Morris indicated that the data he received from Verizon in an electronic format was the same as that contained in state's exhibit 58, he also testified that the data he received from Verizon included information about "which face on that cell tower the call is dealing with" and "something called beam width," we cannot find any information contained within state's exhibit 58 that clearly contains information regarding cell tower faces or beam width.

[7] The defendant asserts that the fact that the jury asked to hear Morris' testimony regarding the cell phone data during deliberation demonstrates that the testimony affected the verdict. We disagree. In the present case, the jury asked approximately eight questions, some of which had multiple parts, during deliberation. Most of those questions involved requests to rehear portions of testimony. The jury's request to rehear Morris' testimony was one of many portions of evidence that the jury asked to review during deliberations. Under the facts of the present case, we cannot conclude that the jury's request to hear Morris' testimony relating to the cell phone data demonstrates that the evidence substantially affected the verdict.

[8] Even assuming that there was no other evidence establishing the identity of the defendant, the present case is distinguishable from *State* v. *Mayell*, supra, 163 Conn. 419, and *State* v. *Payne*, supra, 186 Conn. 179, because there is no other explanation for the presence of the defendant's fingerprints on the victim's vehicle. Unlike the facts of *Mayell*, the fingerprints in the present case were found under such circumstances that they "could have been impressed only at the time the crime was perpetrated . . . ." *State* v. *Mayell*, 426.

[9] General Statutes § 53a-100aa (a) provides in relevant part: "A person is guilty of home invasion when such person enters or remains unlawfully in a dwelling, while a person other than a participant in the crime is actually present in such dwelling, with intent to commit a crime therein, and, in the course of committing the offense . . . (2) such person is armed with explosives or a deadly weapon or dangerous instrument."

[10] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."