******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# IN RE SKYE B.*
## (AC 47760)

Bright, C. J., and Suarez and Westbrook, Js.

*Syllabus*

The respondent father appealed from the judgment of the trial court for the petitioner, the Commissioner of Children and Families, terminating his parental rights as to his minor child. He claimed that the court violated his fifth amendment right against self-incrimination when it terminated his parental rights for failure to rehabilitate on the basis of his unwillingness to admit to the potentially criminal conduct that initiated the underlying child protection case. *Held*:

The respondent father's unpreserved claim that the trial court violated his fifth amendment right against self-incrimination failed under the third prong of *State* v. *Golding* (213 Conn. 233) because the alleged constitutional violation did not exist, as the court's decision was not based on an invocation of the father's right to remain silent but, instead, on his voluntary denials of the existence of intimate partner violence in his relationship with the child's mother, which were contradicted by compelling evidence.

Argued December 19, 2024—officially released February 20, 2025**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Fairfield, Juvenile Matters at Bridgeport, and tried to the court, *Skyers*, *J.*; judgment terminating the respondents' parental rights,

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** February 20, 2025, the date that this opinion was released as a slip opinion, is the operative date for all substantive and procedural purposes.

from which the respondent father appealed to this court. *Affirmed*.

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent father).

*Nisa J. Khan*, assistant attorney general, with whom were *Ciarra J. Minacci-Morey*, assistant attorney general, and, on the brief, *William Tong*, attorney general, for the appellee (petitioner).

*Opinion*

SUAREZ, J. The respondent father, Shane B., appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating his parental rights with respect to his minor child, Skye B.[1] On appeal, the respondent claims that the court violated his fifth amendment right against self-incrimination when it terminated his parental rights for failure to rehabilitate on the basis of his unwillingness to admit to the potentially criminal conduct that initiated the underlying child protection case.[2] We affirm the judgment of the court.

The following facts, which the court found by clear and convincing evidence, and procedural history are relevant to the resolution of this appeal. The Department of Children and Families (department) first became involved with the respondent on February 24, 2021, when the Middletown Police Department reported a domestic incident involving the respondent that occurred on February 2, 2021. During that incident, the respondent and the mother were engaged in a verbal argument that "turned into a physical altercation

---

[1] In the underlying proceeding, the respondent mother, Caleigh D., consented to the termination of her parental rights, and she is not participating in this appeal. All references in this opinion to the respondent are to Shane B. only.

[2] The attorney for the minor child filed a statement adopting the brief filed by the petitioner.

between the two parties and [the respondent] dragged [the mother] out of bed, onto the floor, banging her head into the wall, inflicting injuries to her head and hand. Then he punched a hole into the wall. Thereafter, he grabbed the front of her shirt and lifted her off the ground where she had trouble breathing. At the time . . . Skye was six months old and was in another room during the incident.

"As a result, [the respondent] was arrested and charged with strangulation, assault, criminal mischief and disorderly conduct. . . . The criminal case was still pending in this matter as of the date of the [termination of parental rights] trial. A full no contact protective order was issued where the mother was the protected party. The protective order expired in March, 2023. . . . There is a history of ongoing intimate partner violence where both parents blame each other for the incident."

An order of temporary custody was granted by the court, *Sanchez-Figueroa, J.*, on April 14, 2021, and sustained on April 27, 2021. On February 22, 2022, the court, *Maronich, J.*, adjudicated Skye neglected and committed her to the care and custody of the petitioner. The court issued specific steps for the reunification of Skye with her parents.[3] On August 3, 2022, the petitioner filed a termination of parental rights petition seeking

---

[3] In particular, the court issued the following orders, inter alia, to the respondent: "Take part in counseling and make progress toward the identified treatment goals . . . . Attend and complete an appropriate domestic violence program. Address intimate partner violence/domestic violence with a qualified therapist . . . ." In a section of the orders titled "Other," the court set forth two programs: "24/7 Dads—Participate in parenting program to strengthen understanding of age and developmentally appropriate expectations. Develop a plan for childcare and how you will ensure your child's physical, emotional and social needs are met. Yale [Intimate Partner Violence] Program for Fathers—Demonstrate understanding of how exposure to [intimate partner violence] impacts your child. Develop coping skills to deal with stress in a healthy way. Develop skills which demonstrate no violent or intimidating behaviors toward anyone."

to terminate the parental rights of the respondent and the mother. On January 26, 2023, the respondent filed a motion to revoke commitment.

On January 9 and 10, 2024, the court, *Skyers*, *J.*, held a consolidated hearing on the petitioner's petition for the termination of parental rights and the respondent's motion to revoke commitment.[4] The respondent appeared

---

[4] "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under General Statutes § 17a-112 (j)] exists by clear and convincing evidence." (Internal quotation marks omitted.) *In re Shane M.*, 148 Conn. App. 308, 316, 84 A.3d 1265 (2014), aff'd, 318 Conn. 569, 122 A.3d 1247 (2015) Section 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing . . . may grant a petition [to terminate parental rights] if it finds by clear and convincing evidence that . . . (B) the child . . . has been found . . . to have been neglected . . . or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and [the parent] has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable amount of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." General Statutes § 17a-112 (j) (3) (B) (i). "If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Shane M.*, supra, 316.

"The trial court is required, pursuant to § 17a-112, to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when [he or she] will be able to assume a responsible position in [his or her] child's life. Nor does it require [him] to prove that [he] will be able to assume full responsibility for [his] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life. . . . Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue. . . . [The] completion or noncompletion [of the specific steps], however, does not guarantee any outcome. . . .

and was represented by counsel. Immediately prior to the commencement of trial, the court advised the respondent of his rights, including his right to remain silent and to not testify.

The court heard testimony from Jessica Biren Caverly, a licensed clinical psychologist who performed a court-ordered evaluation of the respondent. In her report, which was admitted as an exhibit at trial, Biren Caverly reported that the respondent "appears to have struggled with completing [court-ordered] specific steps for approximately a year and a half before becoming more consistent with services and visitation in the fall of 2022. However, [the respondent] continues to maintain that he has done nothing wrong and that there has not been intimate partner violence. He represented that the criminal court plans to dismiss his charges once the protective order expires; however, there is no documentation to support this assertion. . . . It is unclear if [the respondent] has limited insight into his behaviors and how they are impacting the current custody situation or if he is intentionally trying to present himself in a positive light. Psychological testing as part of the current evaluation supported that [the respondent] is acting intentionally . . . . It is strongly believed that [the respondent] is now only putting in effort as a way to avoid his parental rights being terminated for his criminal case. Therefore, it is unlikely that he will make significant changes in his beliefs about needing services." According to Biren Caverly, the respondent "initially declined engagement with Fathers for Change and an intimate partner violence program.

"A conclusion of failure to rehabilitate is drawn from both the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B)." (Citations omitted; internal quotation marks omitted.) *In re Niya B.*, 223 Conn. App. 471, 488–90, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024).

He ultimately completed these programs but maintained that he had not done anything wrong and did not need services. . . . Throughout this case, [the respondent] has been reticent about completing necessary services, often putting up impediments for attendance or requiring workers to schedule appointments but then saying that he was no longer available." Biren Caverly "strongly recommended that [the respondent] engage in individual therapy with a provider who can also work with him on gaining a better understanding of domestic violence and its impact on children."

Biren Caverly testified that "[i]t's very concerning if he's not able to take any accountability or ownership with what had happened." She further testified that "[she] had a lot of concerns about [the respondent's] personality functioning. And how much he was able to accept responsibility for what had happened. How much he was able to hear from others how likely he would be to make changes to his own behavior." According to Biren Caverly, the respondent did not demonstrate the type of growth expected for someone who had received counseling in a domestic violence program, regardless of whether that person had actually engaged in domestic violence. She explained that everyone in a relationship could learn from a domestic violence program, even if their relationship did not involve intimate partner violence. According to Biren Caverly, the respondent's continuous denials demonstrated a lack of growth. In her expert opinion, she "did not think it was in [Skye's] best interest to be returned to [the respondent's] care."

The court also heard testimony from Nancy Stewart, a department social worker who prepared a social study dated June 4, 2021. In her social study, which was admitted as a full exhibit at trial, Stewart stated the following: "The last report received [from the office of victim services and family relations] was that [the respondent]

will be recommended to participate in a family violence program regarding his current criminal charges. [The respondent] reports that he is not in agreement with participating in the court recommended services. He maintains that he does not have a need for the services as he has not done anything wrong." Stewart further indicated that the respondent "has been very difficult to engage in treatment planning services . . . becomes angry and defensive when confronted with concerns . . . has unaddressed [intimate partner violence] issues." Stewart testified that she had spoken with the respondent and that he denied having engaged in intimate partner violence. Stewart also testified that she interviewed the mother after the February 2, 2021 incident, and the mother provided her with photographs depicting the injuries and bruising to her hands, arm, neck, and body, as well as a photograph of an indentation in the wall where the respondent had punched it during the incident. The photographs were introduced as full exhibits at trial. Stewart also testified that the mother showed her a copy of a text exchange between the mother and the respondent in which he indicated to her that "you've put hands on me too." Stewart further testified that her investigation revealed that there had been a prior incident of intimate partner violence on December 24, 2020, during which the mother reported to her that the respondent hit her. Stewart testified that, although the mother did not provide much detail about the prior incident of intimate partner violence, the mother characterized the December 24, 2020 incident as worse than the February 2, 2021 incident.

Additionally, the court heard testimony from Randall Brown, a department social worker assigned to Skye's case. Brown prepared a permanency plan study, dated September 9, 2023, and a status report, dated December 19, 2023, which were introduced as full exhibits at trial. Brown reported in the September 9, 2023 permanency

plan study that the respondent "has not been able to achieve a reasonable degree of rehabilitation in order for Skye to be safely return[ed] to his care within a reasonable amount of time," in part due to his noncompliance with the court-ordered specific steps. Specifically, the respondent has failed to "[d]emonstrate an understanding of how mental health and intimate partner violence . . . impacts the ability to safely parent [children] . . . [and] [a]ddress mental health and [intimate partner violence] needs." Brown described the respondent as noncompliant for denying the need for mental health and intimate partner violence treatment as well as minimizing the domestic violence programs he was referred to and the intimate partner violence incident that caused him to lose custody of Skye. In the December 19, 2023 status report, Brown recommended termination of the respondent's parental rights in part because, "although he finished the [intimate partner violence] services, he continues to deny that he was the aggressor and takes no responsibility."

At the hearing, Brown testified that, although the respondent acknowledged to him that he had attended intimate partner violence programs and had listened to the speakers, he did not indicate that he had gained any relevant knowledge concerning intimate partner violence. Brown further testified that the respondent seemingly attended these programs purely for the sake of attendance instead of progress. Brown testified that the petitioner was recommending the termination of the respondent's parental rights because "the respondent hasn't completed or [the respondent] hasn't had any acknowledgment of the issues that brought this case to [the department]. And seen any insight to any changes that he may make . . . with regards to relationships, especially relationships with women."

On April 29, 2024, the court issued a memorandum of decision terminating the respondent's parental rights.

In its memorandum of decision, the court found by clear and convincing evidence that, "[e]arly in the case, [the respondent] found it very difficult to comply with the court-ordered specific steps because he would not engage in many of the recommended services. [The respondent] denied a history of intimate partner violence with [the mother] and said that [the mother] was not telling the truth about the [February 2, 2021] incident. However, in a text exchange with [the mother] on February 12, 2021, he referred to the incident that occurred on February 2, 2021, and stated, '[y]ou put your hands on me too,' essentially providing his admission" that he actively participated in the physical altercation that took place on that date by also putting his hands on the mother. (Emphasis omitted.)

The court provided the following additional analysis: "The department referred [the respondent] to participate in intimate partner violence services at the Yale Fathers for Change program due to the allegation of [intimate partner violence] in the relationship. He completed the intake on October 13, 2021, but, on November 16, 2021, he vehemently declined the services and would not engage in the program, indicating that he had no desire or intent on attending *this little group*.' The Fathers for Change program reported that, on November 29, 2021, they attempted a second time to get [the respondent] started with the program, and, once again, he adamantly refused to engage in the program and declined services. [The respondent] reported that there was no intimate partner violence in the relationship, therefore he did not need the Fathers for Change program. The department referred [the respondent] to the 24/7 Dads Program. He successfully completed it on December 20, 2021, and the reports reflect that [the respondent] was fully engaged.

"[The respondent] was recommended to Southwest Community Health Center (SWCHC) to participate in

a mental health and substance abuse evaluation in October, 2021. [The respondent] denied a history of illicit substance abuse and completed the substance abuse evaluation. However, he failed to complete the accompanying urine screen. He initially claimed that he was unable to get there due to transportation issues. However, even after the department offered to provide transportation, he did not show up and the screening never took place. In November, 2021, [the respondent] participated in a psychiatric evaluation at [SWCHC]. As per the evaluation, he was diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood and was recommended for individual therapy. [The respondent] would not engage in individual therapy as recommended. . . .

"[The respondent] was ordered by the criminal court to engage in the Explore program. Explore is a twenty-six session program for men for intimate partner violence. He was referred in August, 2022, and completed the Explore program in January, 2023. Originally, he was referred to the Family Violence Program . . . a nine week diversionary program. However, the court ordered a more intensive program for this case. . . . The department again recommended [the respondent] for further individual mental health counseling at Birmingham Healthcare . . . in April, 2022. However, [the respondent] felt that he did not need therapy, stating that he 'made it twenty-five years in life without counseling' and decided that he would only engage in the program that was ordered by the criminal court regarding his pending criminal charges." (Emphasis in original.)

The court found by clear and convincing evidence that the petitioner made reasonable efforts to reunify the respondent with Skye. The court further found that the respondent "waited over a year before actively engaging in services and, upon completion of the program, still maintained that he did nothing wrong. [The

respondent] has attended programs such as Explore, 24/7 Dads, and Circle of Security. During the pendency of this case, [the respondent] has repeatedly showed up for an intake, then subsequently refused to engage or participate in the programs that were offered and recommended by the department. His inconsistency speaks volumes to his understanding of the role he played in having his daughter removed from his care. [The respondent] has failed to learn or take anything from the programs he attended and apply them to his life and circumstances. He has been going through the motions and not benefitted from the programmatic substance.

"Over the course of the three years since Skye's removal [the respondent] has failed to gain insight as to the reasons why Skye was removed from his home. [The respondent] continues to deny the very existence of intimate partner violence in the relationship with Skye's mother, notwithstanding the photos of the injuries to her and his text message admission. There is no reasonable prospect that given additional time [the respondent] could assume a responsible position in the life of his daughter Skye."

The court further found by clear and convincing evidence that "Skye . . . has been found in a prior proceeding to have been neglected or uncared for" and that "the respondent . . . has failed to sufficiently adjust his circumstances, conduct or conditions to make it in the best interest of [Skye] to be reunified with him in the foreseeable future. [The respondent] consistently visited with Skye and has only sporadically engaged in the recommended services during the pendency of this case. He has been unable or unwilling to sufficiently address the reasons why Skye was removed from his care and is not able to provide her with a safe, permanent and stable home environment where she would be able to thrive." The court concluded "that the

termination of the [respondent's] parental rights is in the best interest of . . . Skye." This appeal followed.

In this appeal, the respondent does not claim that any of the court's factual findings are clearly erroneous or that the court misapplied the relevant legal principles to the issues before it. Instead, the respondent claims, for the first time on appeal, that the court violated his fifth amendment right against self-incrimination based on his unwillingness to admit to the potentially criminal conduct that initiated the underlying child protection case.[5] Specifically, he argues that the court's determination that he had failed to rehabilitate was improperly "drawn from his refusal to accept responsibility for the February 2, 2021 domestic incident, [and, thus, the court] improperly compelled him to tell [department] investigators and the court-appointed psychological evaluator that he had engaged in criminal conduct in order to avoid the termination of his parental rights." We disagree.

The respondent acknowledges that his claim was not preserved at the time of trial but argues that it is reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Under *Golding* review, which applies in both criminal and civil cases; see, e.g., *Gleason* v. *Smolinski*, 319 Conn. 394, 402 n.10, 125 A.3d 920 (2015); "[a respondent] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record

---

[5] The fifth amendment to the United States constitution provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const., amend. V.

The fifth amendment right against self-incrimination is applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Malloy* v. *Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 239–40; see also *In re Yasiel R.*, supra, 781 (modifying third prong of *Golding*).

"The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the [party claiming error] may prevail." (Internal quotation marks omitted.) *State* v. *Gray*, 342 Conn. 657, 668, 271 A.3d 101 (2022).

We agree with the respondent that the record is adequate to review the claim and that it is of constitutional magnitude, alleging the deprivation of his fifth amendment privilege. For the reasons that follow, however, we disagree with the respondent that a constitutional violation exists and deprived him of his right to a fair trial.

The respondent's constitutional claim presents a question of law over which our review is plenary. See *In re Ivory W.*, 342 Conn. 692, 705, 271 A.3d 633 (2022). "It is well established that [t]he fifth amendment privilege against self-incrimination not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings. . . . Although a defendant has the right to refuse to testify in a civil proceeding when doing so might be incriminatory, [a] defendant

has no absolute right not to be forced to choose between testifying in a civil matter and asserting his [f]ifth [a]mendment privilege. . . . Put another way, the fact that there may be adverse consequences when a defendant invokes the fifth amendment in a civil proceeding does not necessarily mean that the defendant is subject to unlawful compulsion for fifth amendment purposes. . . .

"There are limits, however, to the general rule that an individual constitutionally may be required to choose between accepting the consequences of testifying at a civil trial—namely, the potential for self-incrimination—and accepting the consequences of invoking his or her fifth amendment right to remain silent. The United States Supreme Court has held that a [s]tate may not impose *substantial* penalties because a witness elects to exercise his [f]ifth [a]mendment right not to give incriminating testimony against himself." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) Id., 705–707.

For the right against self-incrimination to be implicated, compulsion is required. "Voluntary statements of any kind are not barred by the fifth amendment. . . . Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Edwards*, 325 Conn. 97, 116, 156 A.3d 506 (2017). Moreover, in civil proceedings, the right against self-incrimination "is not self-executing [and] must be expressly invoked at the time that allegedly incriminatory evidence is sought to be compelled or introduced." (Internal quotation marks omitted.) *Johnson* v. *Raffy's Café I, LLC*, 173 Conn. App. 193, 205, 163 A.3d 672 (2017). Termination of parental rights cases are civil proceedings. See *In re Katia V.*, 214 Conn. App. 468, 486, 281 A.3d 509, cert. denied, 345 Conn. 913, 283 A.3d 980 (2022).

In the present case, the respondent did not testify at trial and never invoked his fifth amendment right to remain silent during the pendency of the case.[6] Instead, he continuously and voluntarily denied engaging in intimate partner violence to Biren Caverly, Stewart, and Brown.

Moreover, contrary to the respondent's assertion, the record does not reflect that the court terminated the respondent's parental rights because he did not admit that his relationship with the mother involved intimate partner violence. Rather, the court found by clear and convincing evidence that there was an incident of intimate partner violence between the respondent and the mother, for which he was arrested and charged with assault, strangulation, disorderly conduct, and criminal mischief, a finding the respondent does not challenge on appeal. The court's findings with respect to this incident were supported, inter alia, by the photographs of the mother's injuries, the damage to their dwelling, and the respondent's self-incriminating text message to her. Consequently, the court's conclusion was not based on the fact that the respondent wanted to remain silent as to the incident but, instead, on the fact that he repeatedly denied that there was any intimate partner violence in the relationship despite evidence to the contrary. The court further found, by clear and convincing evidence, that the respondent was referred to many intimate partner violence programs, from which even a person who had not been involved in intimate partner violence would benefit, yet he consistently failed to gain any insight into the impact intimate partner violence has on children. As the court noted, his participation

---

[6] Moreover, the respondent's counsel conceded at oral argument before this court that the respondent was never coerced to admit responsibility for the incident of intimate partner violence. See *State* v. *Edwards*, supra, 325 Conn. 116 ("[v]oluntary statements of any kind are not barred by the fifth amendment" (internal quotation marks omitted)).

in these services was solely for the purpose of gaining an advantage in his criminal and custody cases. The court reasoned that the respondent's failure to meaningfully engage in these services prevented him from achieving such degree of personal rehabilitation as would encourage the belief that within a reasonable amount of time, considering the age and needs of Skye, he could assume a reasonable position in her life. In sum, the court's decision was based not on an invocation of the respondent's right to remain silent but, instead, on his voluntary denials of the existence of intimate partner violence in his relationship with the mother, which were contradicted by compelling evidence. Consequently, the court's decision did not implicate, let alone violate, the respondent's fifth amendment privilege against self-incrimination. In light of the foregoing, we conclude that the respondent's claim fails under *Golding*'s third prong.

The judgment is affirmed.

In this opinion the other judges concurred.